ATLETWED *v.* CITY OF MARYSVILLE.

1. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE.
    On appeal from judgment upon directed verdict for defendant, case as disclosed by record is viewed in a light most favorable to plaintiff.

2. MUNICIPAL CORPORATIONS—WATER SUPPLY INTAKE PIPE AND CRIB—CONTRACTS—EXCAVATION.
    Under contract with city for construction of water supply intake pipe and crib in nearby river for which the specifications included "necessary excavation" the contract could not be construed as specifying the amount and location of excavation.

3. SAME—CONTRACTS—BIDDERS.
    Generally a contractor bidding on contract for construction of municipal water supply intake pipe and crib is entitled to rely upon the contract, blueprint, plans and specifications prepared by the city and upon engineering practice in that connection.

4. SAME—CONTRACTS—SPECIFICATIONS—RESULTS.
    Under contract for construction of municipal water supply intake pipe and crib in nearby river where specifications and plans bound contractor to the use of such material and employment of such methods as would insure proper alignment of the pipe when placed in final position and that ends of pipe at joints were not separated, stated that the contractor had satisfied himself as to the nature and location of the work, the conditions of the ground, the character, quality and quantity of materials to be encountered, the character of equipment and facilities needed preliminary to and during construction operation, and the general and local conditions and other matters affecting the work, the contractor was bound to use such material and employ such methods as would insure good finished work and a proper alignment of the pipe on the river bottom.

5. SAME—PARTIAL PERFORMANCE OF CONTRACT—DIRECTED VERDICT.
    In contractor's action for balance due under contract and for

---

Unanticipated difficulty affecting one's duty to perform a contract, see 2 Restatement, Contracts, § 467.

Circumstances excusing condition of expert's certificate, see 1 Restatement, Contracts, § 303.

alleged extras furnished defendant city incident to construction of latter's water supply intake pipe and crib in nearby river, fact that plaintiff may have furnished field joints and couplings as specified did not in itself preclude trial court from directing a verdict for defendant where court found contract was not completed.

6. SAME—CONTRACTS—EXTRAS.

Under contract for construction of city water supply intake pipe and crib providing that all work required by either the plans or specifications should be furnished or executed by the contractor and, should any work or material be required which was not therein denoted but which was necessary for the proper carrying out of the intent of the contract, the contractor should perform such work or furnish such material as though it were specified, the contract did not contemplate the furnishing of extra labor and materials.

7. APPEAL AND ERROR—DIRECTED VERDICT—PLAINTIFF'S TESTIMONY.

Upon appeal from judgment entered on verdict directed for defendant at close of plaintiff's testimony, such testimony must be accepted as true.

8. MUNICIPAL CORPORATIONS—CONTRACTS—INSPECTORS—AUTHORITY—MODIFICATIONS—EXTRAS.

Under contract for construction of city water supply intake pipe and crib in nearby river the city inspector had no authority to modify or change the contract nor to bind the city to pay for any extra work or material.

9. SAME—CITY ENGINEER—MODIFICATIONS—EXTRAS—EXCAVATION.

Under contract for construction of city water supply intake pipe and crib in nearby river the city engineer had no authority to change or modify the contract but could bind the city for payment of extra work or material found necessary which the contractor was not bound to furnish; hence, since contract required contractor to perform all necessary excavation, the engineer could not bind city for payment therefor as extra work.

10. SAME—EXTRAS—EXCAVATION.

Contract for construction of city water supply intake pipe and crib was not subject to change except by authorization of the city council; hence, where contract required contractor to perform all necessary excavation and record fails to disclose any action by the council changing, altering or modifying the contract, he was not entitled to extra remuneration for excavation alleged to have been in excess of requirements indicated by blueprint of river bottom.

11. SAME—CONTRACTS—ACCEPTANCE OF COMPLETED WORK—RECORD.

In action for balance due under contract for construction of city water supply intake pipe and crib in nearby river, record failed to disclose that the city engineer ever accepted the work as a completed job or approved the material, method or manner of plaintiff's work or that the city council had approved or accepted it.

12. SAME—TESTING OF WATER SUPPLY INTAKE PIPE AFTER SUBMERGENCE.

Finding of trial court that test of city water supply intake pipe and crib after it had been submerged had not been made in accordance with the specifications for its construction *held*, not error, in view of plaintiff's concession that the test was not made in the presence of the city engineer or that notice of intent to make a test had been given to the engineer.

13. SAME—FRAUDULENT SPECIFICATIONS—EVIDENCE.

In action for balance due under contract for construction of city water supply intake pipe and crib, record *held*, to disclose no defective or misleading specifications as to condition of river bottom responsible for failure of the construction.

14. SAME—WATER SUPPLY INTAKE—REPAIRS—AUTHORITY—RECORD.

In action to recover sums spent in repairing damage to city water supply intake pipe and crib in nearby river which had been caused by logs and current of the river after the pipe had been submerged by contractor who had just constructed it but before the city engineer had issued certificate showing contractor's performance of the work, city *held*, not obligated to pay, under record failing to disclose authorization by council to make such expenditure.

Appeal from St. Clair; George (Fred W.), J. Submitted June 6, 1940. (Docket No. 40, Calendar No. 40,989.) Decided October 7, 1940.

Assumpsit by Frank C. Atletwed against City of Marysville, a municipal corporation, to recover balance allegedly due on contract for the construction of a water supply intake for extras and repairs. Directed verdict and judgment for defendant. Plaintiff appeals. Affirmed.

*Walter M. Nelson,* for plaintiff.

*Burt D. Cady (Lloyd V. Marlette* and *Frank H. Lee,* of counsel), for defendant.

CHANDLER, J.   The defendant city of Marysville borders on the St. Clair River, and early in 1937 it determined to construct a filtration and pumping station and the necessary intake apparatus for waterworks for said city, as well as for a distribution system in connection therewith.   Plans and specifications for the construction thereof were prepared and sealed proposals for construction in accordance with said plans and specifications were advertised for.   Separate bids were asked, that is, bids for the filtration and pumping station, for the intake apparatus and for the distribution system in accordance with plans and specifications which had been prepared for each.

Plaintiff, an experienced engineer and contractor, made a proposal for the construction of the water supply intake, the material part thereof being as follows:

"The undersigned declares that he has carefully examined all of the items of the accompanying plans, contract and specifications, and that he fully understands the requirements of the same.   That he will contract to provide all necessary equipment, machinery, tools, labor and material necessary to complete the work in accordance with the specifications and will accept as full payment for the same, the following sums, to-wit:
For approximately 570 lin. ft. of 24-in. cast iron intake, complete in place:   Twelve dollars, no cents per lin. ft. $12   Total $6,840.   * * *
For approximately 570 lin. ft. of 24-in. steel intake, complete in place:   Ten dollars, no cents per lin. ft. $10   Total $5,700.

For intake crib, complete in place with cast iron fittings: Five hundred dollars, no cents    Total $500
Lump Sum
For intake crib, complete in place with steel fittings: Five hundred dollars, no cents.    Total $500
Lump Sum

"The undersigned agrees to commence work within three days after the contract has been duly executed and approved and to complete the work on or before November 1, 1937."

Plaintiff's bid was accepted and on August 14, 1937, a contract was entered into between the parties, the essential part thereof being as follows:

"The contractor shall furnish all the material, superintendence, labor and equipment and shall defray such other costs as are necessary to complete in a workmanlike manner to the satisfaction and acceptance of the engineer, the work shown on the plans entitled Water Supply Improvements and in accordance with the information for bidders, general conditions and specifications forming part of this contract.

"The work covered by this contract shall be commenced Aug. 17, 1937, and be completed on or before the 1st day of November, 1937. * * *

"And in consideration of the completion of the work described herein and the fulfilment of all stipulations of this agreement, the first party shall pay to the contractor the amount due him based on the following prices:

"For approximately 570 lin. ft. of 24-in. Steel Intake, complete in place:

"Per lin. ft. price in writing—Ten dollars, no cents per lin. ft.—figures—$10.

"For Intake Crib, complete in place with steel fittings:

"Five hundred dollars.   Lump sum—$500.

"Total: Six thousand two hundred dollars—$6,200.

"Contract for Water Supply Intake."

To quote in full the plans and specifications which were made a part of this contract would not only make this opinion an unjustifiably lengthy one, but would not serve any useful purpose. We will, therefore, be content in calling attention to such portions thereof as will necessarily be the subject of discussion in the determination of the controversy involved in this appeal.

"Work Included:

"The work shall consist of furnishing and placing a crib, complete, with all necessary pipe and fittings as shown on plans and as hereinafter described, at the outer end of a 24-in. intake pipe, and furnishing and placing a 24-in. intake pipe, complete, from the crib to the location on shore shown on plans, and shall include necessary excavation.

"Water Depths:

"Water depths shown on plans are taken from detailed soundings made by the U. S. Engineers Office in 1934. * * *

"Steel Pipe and Fittings: * * *

"Pipe shall be furnished in lengths not exceeding 40 ft. Not more than two sections of pipe shall be welded together to make up one length.

"Each end of each length of pipe shall be properly prepared for receiving the type of coupling selected.

"Field joints shall be made with Dresser Style No. 38, or equal standard pattern coupling applied complete in exact accordance with manufacturer's instructions. Couplings shall be completely covered with a heavy coating of bituminous material similar and equal to material used for pipe coating. * * *

"Bends shall be made from sections welded in substantially the same manner as welds in pipe, and no single angle within bend shall exceed 30 degrees.

"Methods of Construction:

"Methods of construction will generally be left to the discretion of the contractor as long as satis-

factory progress is made and good finished work is produced. The methods used shall insure proper alignment of pipe when placed in final position, and shall insure that ends of pipe at joints have not been separated.

"While pipe is being placed, the methods of construction and materials and equipment used shall provide against deflecting the pipe joints more than the standard amount allowed by the manufacturer of the joint used. * * *

"Testing:

"When the crib is placed, a removable watertight plug or cap shall be fitted to the outer end of the pipe, and on completion of laying the intake, a watertight plug or cap shall be fitted to the shore end of the pipe. The contractor shall make a suitable water connection to the plug at the shore end. A test pump shall be attached to this connection, and a pressure of not less than 20 lbs. per sq. in. shall be applied to the entire intake pipe. While this pressure of 20 lbs. is maintained, the loss of water shall not exceed a rate of two gallons per hour per inch of diameter of pipe per 1,000 lin. ft. of pipe.

"Should the loss exceed this amount, the contractor shall immediately make substantial repairs as needed to meet this requirement.

"The contractor shall supply a suitable pump, pressure gauge and meter for making this test, and the test shall be made in the presence of the engineers.

"After testing is completed, the contractor shall remove the plug (or cap) from the outer end of pipe. If the contractor wishes to remove the test plug (or cap) from the shore end of the pipe, he shall replace it with a temporary bulkhead which will prevent materials from entering the pipe during construction to follow.

CONSTRUCTION CONTRACT. * * *

"Contractor's Understanding:

"It is understood and agreed that the contractor has, by careful examination, satisfied himself as to

the nature and location of the work, the conditions of the ground, the character, quality and quantity of materials to be encountered, the character of equipment and facilities needed preliminary to and during construction operation, the general and local conditions and other matters which may affect the work under this contract.

"No verbal agreement or statement shall affect or modify any of the terms of this contract.

"Intent of Plans and Specifications:

"All work required by either the plans or specifications shall be furnished and executed by the contractor and should any work or material be required which is not denoted in the specifications or plans but which is necessary for the proper carrying out of the intent thereof, the contractor shall perform such work and furnish such material as fully as if they were completely described. * * *

"Report of Error and Discrepancies:

"If, in the course of the work, the contractor finds any discrepancies between the plans and the physical conditions encountered in the work or any error or omissions in the plans or in the layout, it shall be his duty immediately to inform the engineer in writing. Any work done after such discovery, until authorized by the engineer, will be done at the contractor's risk. * * *

"Authority and Duties of Inspector:

"Inspectors may be appointed and directed to inspect materials used and work done. The inspection may extend to the preparation or manufacture of the materials for use in the work. Inspectors will not be authorized to revoke, alter, enlarge or relax any of the provisions of these specifications nor to change the plans in any particular, nor will they be authorized to approve or accept any portion of the completed work. * * *

"Inspection:

"All work and material shall be at all times open to the inspection of the engineer or his duly authorized representative. The contractor shall

give the engineer reasonable notice of starting new work and shall provide all reasonable and necessary facilities for inspection even to the extent of taking out portions of finished work. In case the finished work so torn out is found satisfactory, the cost of taking out and replacement will be paid by the owner. No work shall be done at night without the previous approval of the engineer. * * *

"Defective Work and Material:

"Any failure or omission on the part of the engineer to disapprove or reject any material or work shall not be construed as acceptance of any defective work or material. The contractor shall remove any work or material condemned by the engineer and shall rebuild or replace the same without extra charge. * * *

"Changes:

"The owner shall have the right to make any changes that may be hereafter determined upon in the nature or dimensions of work, whether before or after its commencement and such changes shall in no way effect [affect?] or void the obligations of this contract. If such changes make any change in the cost of the work, an equitable adjustment shall be made by the engineer to cover the same.

"Extra Work:

"No bill or claim for extra work or materials shall be allowed or paid unless such extra work or material shall have been ordered by the engineer.

"A just price for such work shall be determined by the engineer, who may either fix a lump sum price or may, if he so elects, provide that the price shall be determined by the actual cost, to which shall be added 15 per cent. to cover general expenses, profits, contingencies, use of tools, contractor's risk and liability.

"If the contractor shall decline or fail to perform such work or furnish extra materials as authorized by the engineer, the owner may then arrange for the performance of the work in any manner it may

see fit, and the contractor shall not interfere with the performance of the work."

Attached to the contract was a blueprint, on the lower right-hand corner of which appeared the following:

> "Marysville, Mich.
> Soundings taken from
> records of U. S. Engineers
> PATE & HIRN
> July, 1937"

However, the date of these soundings is shown by the specifications, made a part of the contract, to have been taken by the U. S. Engineers' office in 1934. Pate & Hirn were the engineers for the defendant city.

The importance of the foregoing will appear later.

It is the claim of plaintiff that work was commenced under the contract on August 25, 1937; that on September 22, 1937, while the work was in progress, there was revealed a great discrepancy between the river bottom as shown by the blueprint above referred to and as it actually existed; that the city's engineer ordered him to make soundings of the river from the river bank to the channel bank; and that soundings were promptly taken by the contractor's engineer and one Charles Ash who was acting as an inspector for the city. The field notes were presented by plaintiff to the city engineer and plaintiff claims that the engineer on the basis of this information authorized and directed him to make an additional excavation, varying from practically no excavation to a depth of 20 feet, for a distance of 120 feet into the river, and agreed to pay him the sum of $3 per yard for such excavating, and further, that the number of yards for which he was to receive extra compensation was 347. It is also

the claim of plaintiff that the city, by the graph and plan submitted by its engineer, fixed the river bed on which he was directed to lay the intake pipe regardless of the actual contour of the river bottom at the time of construction.

Plaintiff claims that after construction of the crib and the completion of the coupling of the intake pipe, he made preparations for submergence of the pipe which was begun on October 31st; that he called Mr. Ash, the inspector, who, accompanied by plaintiff and the captain of a tug boat, inspected every joint and announced "they were all perfect, to his satisfaction;" and that the pipe and couplings with a total weight of 78,000 pounds were left floating on the river for 24 hours, indicating that the pipe was tightly joined in accordance with specifications. After submergence of the crib and intake pipe, certain tests were made in accordance with the specifications in the presence of and with the approval of Mr. Ash as inspector for the city. These tests showed the registration of the required pressure and it was determined that the pipe was in good order. The results of these tests were given by plaintiff to Mr. Hirn, the city engineer, over the telephone, and Mr. Hirn replied: "I am tickled to death you got any kind of test and that is fine." Plaintiff claims that the work was then all done and that on November 4th he announced to the inspector, the mayor, the councilmen, the city assessor, who was an engineer, and the superintendent of the filtration plant that the work was completed.

Sometime after November 4, 1937, plaintiff claims that he agreed to have the pipe on the river bed inspected by a diver at the expense of the city. This inspection was made November 17, 1937. The report of the diver, according to plaintiff's claim, was given orally to the inspector in the presence of plaintiff. The report, according to plaintiff, was

that he, the diver, had begun at the crib and found that a great quantity of large logs, one of them three feet in diameter and 30 feet long, had struck and ruptured the second joint from the crib; that on another joint the wire welded hooks were broken and it looked as though that joint had been pushed down stream; that about 30 years previously a hole had been dug in the bed of the river to make a dock at Marysville and this hole made a slope so that a considerable portion of the pipe actually lay on the side of the hill and that the current had a tendency to roll the pipe into this hole. Plaintiff claims that he and the inspector reported the situation to the council, and plaintiff then stated that his contract was completed; that shortly thereafter plaintiff, the diver and the city's engineer "discussed the method of doing the extra work on the pipe line;" and that the engineer directed plaintiff to have a split sleeve 24 inches long made with rubber gaskets which the diver was to take down, pull the pipe to alignment and apply the split sleeve, thus making "an adequate repair."

Plaintiff further claims that he asked Mr. Hirn, the engineer, for authorization in writing but that the latter explained that he was very busy and promised that "he would get it out;" that he wrote the engineer several letters but the engineer would never answer them; and that at a council meeting held later, where the extra work was authorized, all of the members and the mayor were present, but whether there was formal action by the council plaintiff did not recall. He claims that all of the members of the council and the mayor "entered into the discussion" and their direction to him was "unanimous;" that they told him to do the work. It was plaintiff's idea that "they were in regular session." He claims that pursuant to the engineer's directions for the repair on this open joint, that he

ordered two split sleeves at a cost of $30 and the required gasket and bolts at a cost of $17, and that on November 26, 1937, the split sleeves, gasket and bolts were ready and a derrick with a scow, tug boat and other marine appliances were ready to serve the diver; that when the diver reached the pipe he found two joints were apart, the joint shoreward, from the one first found to be parted, had given away and that length of pipe had rolled down the river 20 feet in those few days. The pipe was located and brought to the surface and plaintiff claims that for 26 days he attempted to replace this length of pipe, and that in that time he made up two of the joints three times and one of the joints twice; that he finally completed the extra work and repair authorized by the council and the engineer, using the split sleeves as specified. He claims that the cost of the repairs discussed with the city engineer and ordered by its council and mayor amounted to $7,701.34, and claims to be entitled to payment of that amount in addition to the balance due on the contract of $4,200. The city refused payment of the claim and this suit followed.

Plaintiff commenced his action by declaration, which consisted of two counts, count one being on the contract between himself and the city wherein he alleged that he had,

"Furnished and supplied all work, labor, materials, appliances, equipment and supervision as specified and according to specifications, in strict accordance with said plans and specifications, and fully performed the said contract and fully discharged each and every obligation on his part thereunder to be performed and discharged. * * *

"That during and in the course of the performance of the said contract and the construction and installation of the said water supply intake and in compliance with and by virtue of the said contract

and undertaking, this plaintiff furnished and supplied certain extras and hereinafter charges therefor a fair, reasonable and going price. * * *

"That immediately following the completion by plaintiff of the said water supply intake in strict accordance with the said contract, plans and specifications, and repeatedly thereafter plaintiff requested said defendant to inspect and approve the same and said defendant, not regarding its duty so to do, neglected and refused to inspect the said water supply intake and neglected and refused to state whether it accepted or declined the same and thereby, after due warning and notice, said defendant froze the credit of plaintiff and made it impossible for him to bid on other work, to obtain the required bonds or credit therefor and by refusing to pay its obligation to plaintiff, the said defendant has retained and prevented plaintiff from using his funds, cash or credit and has prevented plaintiff from bidding upon or accepting any other contracts, construction or work, plaintiff being a general contractor.

"Wherefore, plaintiff demands judgment against defendant of $22,000.''

In count two, plaintiff declared upon all of the common counts in assumpsit.

He filed the following bill of particulars:

"December 20, 1937—Contract Balance..$4,200.00
December 22, 1937—Extra work and
   materials .......................... 7,701.34
February 26, 1938, and continuing.—
   Damages by retention of funds and
      money and by tying up credit of
      plaintiff .......................10,000.00
                                    $21,901.34''

Plaintiff later filed an additional bill of particulars, making specific the items set forth in the original bill filed as aforesaid.

Defendant filed its answer to the declaration, denying that plaintiff had completed his contract in accordance with the plans and specifications which were a part of said contract. It denied that he had furnished extra materials or performed extra work for defendant in accordance with the terms of said contract or in the course of construction of a water supply intake for it. It denied all of the allegations contained in count two of the declaration and insisted that defendant was not indebted to plaintiff in any sum, it having derived no benefit whatsoever from any material furnished or work performed by plaintiff. It alleged that plaintiff had abandoned the construction of said intake system and that defendant was entitled to recover from plaintiff the $2,000 that it had paid to him during the period he was undertaking the construction of such system.

Upon the trial of the case, plaintiff was the only witness. At the conclusion of his testimony, he rested his case.

Defendant thereupon, by its counsel, made the following motion:

"May it please the court, the defendant asks the court to direct the jury to return a verdict of no cause of action in favor of the defendant and against the plaintiff, for the following reasons:

"1. That under the uncontradicted evidence in the case, there is no question to go to the jury.

"2. That under all of the evidence in the case, the defendant is entitled to a verdict to be directed in his favor.

"3. That the plaintiff has not performed his contract in accordance with the invitations for bids, his proposal, the contract, plans and specifications and general conditions.

"4. That the plaintiff has failed to establish by evidence that he is entitled to any extras.

"5. And the plaintiff has failed to establish by evidence that there is any additional or supplemental contract arising out of his attempt to perform the contract.

"6. That the plaintiff failed to complete his work in accordance with the terms of the contract.

"7. That the plaintiff has failed to make proper tests as required under the contract.

"8. That the plaintiff has failed to secure a certificate from the defendant's engineer that the work had been completed in accordance with the terms of the contract.

"9. That the plaintiff has failed to establish his right to recover any damages whatsoever.

"10. That the plaintiff has failed to establish that he is entitled to recover under any of the allegations contained in his declaration—in the declaration.

"11. That no theory of recovery advanced by the plaintiff is substantiated by evidence that would warrant a verdict."

After argument of counsel on the motion, the following occurred:

"*The Court:* I want to say to you gentlemen, that this court or any court, as I believe, would rather do anything than direct a verdict, but I have reviewed very carefully the record in this case, the testimony of the plaintiff, I have spent hours, in fact, we all have, but I have spent hours in analyzing the provisions of this contract; and viewing the case of the plaintiff, as the record disclosed, in a light most favorable to the plaintiff, this court is of the opinion that there is no question of fact that can be submitted to the jury, and therefore, a directed verdict is ordered.

"Now, so that the plaintiff will understand more clearly in detail the reasons of the court, the court will supplement this, today, or tomorrow, with a carefully written opinion, and after which, of course, each will be served with a copy, and after

that, plaintiff, of course, is entitled to time as provided in the rules, for motion for new trial or appeal. Mr. Court Officer, will you bring in the jury.

"*Mr. Nelson:* Of course, we would like the reasons for the direction of the verdict prior to the discharge of the jury, because if there is anything that is wanting in the proof, we could supply that.

"*The Court:* I think the court has the privilege of just directing a verdict cold-bloodedly, and I can do that, but I am going to say, I think I have the privilege also of letting you and Mr. Cady know my reasons.

"*Mr. Nelson:* It would not aid the plaintiff much if the jury has been discharged before we know the reasons. I don't care to put anybody to any unnecessary trouble, because I have enough to do, but perhaps I could assist the court by inquiring whether it is any want of proof?

"*The Court:* No, it is not want of proof.

"*Mr. Nelson:* Then we should offer to furnish it and ask the court for the opportunity to do so.

"*The Court:* No, it is not on that ground at all.

"*Mr. Nelson:* That would dispose of that as a suggestion.

"*The Court:* I don't want to keep the jury here. We have some other cases." * * *

"*The Court:* I will say to the members of the jury, that after a careful consideration, the court finds that there is no question of fact to be submitted to you in this case, and therefore, your verdict will be in favor of the defendant and against the plaintiff, of no cause of action. That will be your verdict."

The record shows that the trial court's "reasons for direction of verdict were dictated into the record by the court June 13, 1939," that being the day that the trial was concluded, and according to the calendar entries were filed with the clerk on June 14th,

Plaintiff's claim of appeal followed the entry of judgment on the verdict rendered.

As we consider this appeal, the question presented is: Viewing the entire case of the plaintiff as disclosed by the record before us in a light most favorable to his contentions, did the court err in directing a verdict for defendant of no cause of action?

With the foregoing question presented for our consideration, we have scrutinized the record most carefully as well as plaintiff's brief in support of his statement of questions involved.

1. Plaintiff insists that the contract, plans, and specifications prepared by defendant specified the amount and location of excavation and the kind and make of pipe couplings.

We fail to find where any controversy exists as to the kind and make of the pipe couplings. The specifications provided "Field joints shall be made with Dresser Style No. 38, or equal standard pattern coupling." The contractor was not limited to the use of the Dresser Style, but could use one of equal standard. We do not understand from the record that there is any claim that the coupling specified or used was inefficient for joining pipe together if laid on the river bed in proper alignment and sufficiently anchored.

We are not in accord with plaintiff's contention that the plans, specifications and blue print prepared by defendant's engineer specified the amount and location of the excavation required, but do find that the specifications required the "furnishing and placing a crib, complete, with all necessary pipe and fittings as shown on plans and as hereinafter described, at the outer end of a 24-inch intake pipe, and furnishing and placing a 24-inch intake pipe, complete, from the crib to the location on shore shown on plans, and shall *include necessary excavation.*"

2. Appellant's second question in his statement of questions involved is: "Was plaintiff entitled to rely upon the contract, blueprint, plans and specifications prepared by defendant and upon engineering practice in that connection?"

As a general proposition this question must be answered in the affirmative. It is plaintiff's contention that he furnished the material specified as well as the work and labor required to complete the intake system for the waterworks plant of defendant, but did not assume the risk that the completed job would stand the current of the St. Clair River; and further, that the failure of defendant to furnish adequate blueprints and specifications was the factor that was responsible for his inability to complete an adequate water intake system for said city, his claim being that the blueprint of the river bottom, taken from "soundings taken from records of U. S. Engineers," informed him that such soundings were taken in July, 1937; that he completed the crib and prepared the pipe for submergence in reliance thereon and that by reason of such misinformation any extra material, work, expense or risk in connection with aligning the pipe to conform with the then existing contour of the river bottom must be assumed by the city.

We are not in agreement with plaintiff that the blueprint in question indicates that the date of the soundings taken by U. S. Engineers was "July 1937." An examination of this blueprint indicates to us that the date thereon shows the date of the preparation of the blueprint by the engineers for the city. However, if there is merit to this contention of plaintiff it is dispelled by the second paragraph of the specifications, under subtitle "water depths," which states "Water depths shown on plans are taken from detailed soundings made

by the U. S. Engineers Office in 1934." It would
not require an experienced contractor or an engineer
to know that the contour of the bottom of a nav-
igable stream, such as the St. Clair River, approxi-
mately 2,000 feet in width, with a rapid current,
subjected to extensive navigation as well as ice and
wind, would necessarily change very materially in
three years. Further, we call attention to those
portions of the specifications hereinbefore quoted
under subtitles "Methods of Construction" and
"Contractor's Understanding." These portions of
the specifications and plans clearly bind plaintiff
to the use of such material and the employment of
such methods as would insure good finished work
and a proper alignment of the pipe on the river
bottom, thus bringing to the city what it was con-
tracting for, a water intake system to its water-
works plant. The record is conclusive that such
result has not been obtained.

3. "Did plaintiff furnish field joints and couplings
as specified?" Plaintiff's testimony is to the effect
that he did. Therefore, this question must be
answered in the affirmative; but this answer does
not change the question of law involved, viz., did
the court err in directing a verdict for the defend-
ant?

4. Appellant's next question contained in his
statement of questions involved is, "Did the con-
tract prepared and submitted by defendant con-
template errors, changes and extras including field
joints and pipe couplings and excavations?"

A complete answer to this question is found in the
construction contract under the subtitle "Intent of
plans and specifications," hereinbefore quoted in
full.

A completed intake water system was contem-
plated by the contract and specifications, and the

record is conclusive that this was never furnished by plaintiff to the city.

5. Plaintiff claims that he was authorized to make extra excavation at an agreed price. His testimony relative to his authorization to do this so-called extra excavation, which we must accept as true, follows:

"*Q*. And what was the conversation with respect to this item?

"*A*. We showed ·Mr. Hirn our finding, and he asked us how much per yard we would ask to do the excavation necessary so that the pipe might lie on the bottom in the correct manner. We told him three dollars a yard and recommended a certain line that we should excavate.

"*Q*. Did that end that conversation or did you go on and complete your arrangement?

"*A*. Mr. Hirn advised us that he would tell us how much excavation to perform.

"*Q*. Now, he had Exhibit 17, or a copy of it?

"*A*. He did.

"*Q*. Did you talk to him again on this subject?

"*A*. Yes.

"*Q*. When?

"*A*. Several days later.

"*Q*. And by several, what do you mean?

"*A*. A week.

"*Q*. Somewhere in there?

"*A*. Yes.

"*Q*. Where was he?

"*A*. On the job.

"*Q*. And what was the conversation?

"*A*. When are we going to get the authorization to do the extra excavation?

"*Q*. That is what you asked Mr. Hirn?

"*A*. Yes.

"*Q*. What was his reply? ·

"*A*. Replied that he had been in court in Mt. Clemens and had not gotten to it, but he would get it out as soon as he could.

"*Q*. Did you talk to him again on the subject?

"*A*. No.

"*Q*. Did you talk to the officers of the City of Marysville on the subject?

"*A*. We received authorization from the inspector on the job to proceed with the excavation to a point 120 feet from the shore line.

"*Q*. That is Mr. Charles Ash?

"*A*. Yes.

"*Q*. Do you remember when you got that authorization?

"*A*. October 4th.

"*Q*. 1937?

"*A*. Yes. * * *

"*Q*. By the way, while I am on the subject, I believe I overlooked asking you whether you talked to Mr. Hirn again; you stated before recess that he asked you what the cost of that excavation would be, and you stated three dollars a yard?

"*A*. Yes, sir.

"*Q*. Did you talk to him about that?

"*A*. Yes, sir.

"*Q*. What was the conversation?

"*A*. Mr. Hirn told me to make the excavation in accordance with the instructions I had received from his inspector.

"*Q*. And was anything said about the price?

"*A*. He said that the price of three dollars was all right and was accepted."

The inspector had no authority in any way to modify or change the contract. Neither did he have authority to bind the city to the payment for any extra work or material.

The city engineer was without authority to change or modify the contract but would have authority to bind the city for payment for extra work found necessary. He would not, however, have authority to bind the city for payment of extra compensation for work or material that plaintiff was bound to furnish under his contract. Plaintiff's contract

bound him to perform all necessary excavation. No change could be made in this contract except by authorization of the city council. The record does not disclose any action by the city's legislative body changing, altering or modifying the contract involved. The provisions of the contract clearly bound plaintiff to furnish all material, work and necessary excavation to provide defendant with a waterworks intake system.

6. Plaintiff states his sixth question involved as follows: "Was the work and material of plaintiff inspected by defendant and did it have the effect of approval of material, method and manner of plaintiff's work?"

Before discussing this question it is deemed necessary to call attention to portions of the construction contract hereinbefore quoted under subtitles "Authority and Duties of Inspector," "Inspection," "Defective Work and Material," "Acceptance," and "Final Estimate."

The joints and couplings on the pipe were inspected by the inspector before submergence and pronounced satisfactory by him. He, however, had no authority to approve or accept any portion of the completed work. The engineer was given no notice in writing that the work was ready for inspection before submergence, but within a few days thereafter received the report of the diver to the effect that the pipe had been laid on a side hill and that the current of the river and debris had caused the separation of the pipe at some of the joints, and that sections of the pipe had drifted down the river some distance. The record fails to disclose that the engineer either by word, act or in writing ever accepted this work as a completed job, or did anything that had the effect of approval of the material, method or manner of plaintiff's work. Neither does the record disclose that the city, by

any legislative act, did anything indicating an approval or acceptance of this job.

7. "Was the crib and intake pipe tested after submergence as required by the contract?"

The specifications under subtitle "Testing" provided:

"When the crib is placed, a removable watertight plug or cap shall be fitted to the outer end of the pipe, and on completion of laying the intake, a watertight plug or cap shall be fitted to the shore end of the pipe. The contractor shall make a suitable water connection to the plug at the shore end. A test pump shall be attached to this connection, and a pressure of not less than 20 lbs. per square inch shall be applied to the entire intake pipe. While this pressure of 20 lbs. is maintained, the loss of water shall not exceed a rate of two gallons per hour per inch of diameter of pipe per 1,000 lin. ft. of pipe.

"Should the loss exceed this amount, the contractor shall immediately make substantial repairs as needed to meet this requirement.

"The contractor shall supply a suitable pump, pressure gauge and meter for making this test, and the test shall be made in the presence of the engineers.

"After testing is completed, the contractor shall remove the plug (or cap) from the outer end of pipe. If the contractor wishes to remove the test plug (or cap) from the shore end of the pipe, he shall replace it with a temporary bulkhead which will prevent materials from entering the pipe during construction to follow."

Plaintiff concedes that the test he made was not in the presence of the engineer. Neither does he claim that any notice of his intent to make the test was given to the engineer. Under these circumstances, we do not find that the trial court was in error in holding that plaintiff had failed to show

that a test was made in accordance with the specifications.

8. Plaintiff states his eighth question as follows: "Was the failure of the intake pipe chargeable to defective specifications with respect to field joints or pipe couplings and excavation or bed for laying the same?"

Plaintiff's testimony fails to disclose any defects in the plans and specifications other than that he was misinformed as to the condition of the river bottom by the blueprint attached to and made a part of the specifications and contract, claiming that such blueprint informed him that it was taken from soundings made by U. S. engineers in July, 1937. To go into detail in the discussion of this question would mean a repetition of what we have already said in reference to the same subject. We hold that the record discloses no defective or misleading specifications.

9. "Was the city bound to pay for the work done by plaintiff subsequent to performance of the contract and submergence of the intake?"

We think this question can best be answered by adopting as a part of this opinion the conclusions reached by the trial court in his determination of the questions involved.

"On page 8 of General Conditions, under the subject of Acceptance, it is provided that the work shall be inspected for acceptance by the engineer promptly upon receipt of notice in writing that the work is ready for such inspection. On the same page in the following paragraph under the head of Final Estimate, it is provided that upon the completion and acceptance of the work, the engineer shall execute a certificate showing that the work provided for in this agreement has been completed and accepted by him, et cetera. And the contract itself

provides that the contractor shall furnish all the materials, superintendency, labor and equipment, and shall defray such other costs as are necessary to complete in a workmanlike manner to the satisfaction and acceptance of the engineer, the work shown on the plans entitled Water Supply Improvements, and in accordance with the information for bidders, general conditions and specifications forming part of this contract.

"The record fails to disclose that there has been any waiver on the part of the defendant of any of the provisions of the proposal, general conditions, specifications, and contract, herein referred to and the court finds, as a matter of law, that there is no evidence of the contract having been completed by the plaintiff in accordance with his agreement, and therefore, that he is not in any position to maintain any suit for recovery of the several items referred to in his bill of particulars.

"The court is of the further opinion that the provisions of this contract are binding, just as much so as in any other contract. The fact that it is an engineering project does not mean that these provisions can be set aside at the whim of the contractor or the owner, otherwise, there would be no necessity for any express contract. If the contractor had done as he says he has done in the contract, that is, among other things, satisfied himself 'as to the nature and location of the work, the conditions of the ground,' he would have known that the pipe could not be satisfactorily laid without further excavation, and then he could have either refused a bid or included the price of the extra necessary excavation in such bid.

"As to the conditions of the ground, the only ground in the case is that which lies under the water along the line provided for the placing of the intake. The word 'ground' cannot have any other meaning. It cannot be interpreted as merely a superficial glance at the area; if that were the case, the

interpretation of the word 'ground,' in that respect, would be an absurdity.

"The contractor on the record stated, that he did not depend entirely upon the alleged authorization of the city commission, but more upon the accepted authorization, in writing, by the engineer, which he did not receive, and there is no proof of any fraud on the part of the engineer in failing to issue the necessary certificate to conform to the provisions of the contract.

"It is further the opinion of the court that where additional work, necessitating the expenditure of thousands of dollars in addition to the bid of the contractor, is proposed, that the engineer's authorization should be passed upon by the owner before becoming operative. Now, there is no evidence in the case that the city commission made any express authorization. They were there at their meeting place, whether at a regular meeting or a meeting specially called, is unknown from the record, and the members casually said something about going ahead with the work. The question is, under those circumstances, can the city commission spend thousands of dollars of the taxpayers' money under such a superficial act. It is true the cases hold that where a municipality is enjoying a benefit, then that municipality must pay for same, but in this case, no benefit was derived from the work of the contractor. In any event, it would be necessary that the owner be informed as to the necessity arising from these conditions, which should have been known to the contractor, and which he says were known to him, but there is no evidence to show that the owner, that is, the municipality, was ever informed as to the added expenses which such additional work would necessitate.

"The court finds that the plaintiff is not entitled to recover any of the sums of money asked for in his bill of particulars occasioned by the city's failure to pay him the balance of his contract, and his

claimed extras, through which it is claimed he was unable to bid on other contracts and thereby lost the sum of $30,000 profit.

"So far as the claimed unpaid balance of the contract is concerned, and other allegations contained in plaintiff's declaration in the nature of common counts, et cetera, the court finds, as a matter of law, that plaintiff, failing to have completed his contract, make a proper test and receiving the certificate of the engineer, is not in a position to recover in this action."

Judgment affirmed, with costs to defendant.

BUSHNELL, C. J., and SHARPE, NORTH, McALLISTER, and BUTZEL, JJ., concurred with CHANDLER, J. WIEST, J., concurred in the result. The late Justice POTTER took no part in this decision.