W. H. KNAPP CO. *v.* STATE HIGHWAY DEPARTMENT.

1. STATES—CONTRACTS—TORTS—SOVEREIGN IMMUNITY.
   Action by road contractor against State highway department to recover under contract because of greater difficulty in excavating than that represented by the specifications would not be subject to application of the doctrine of sovereign immunity since the action does not count on tort.

2. HIGHWAYS AND STREETS—SPECIFICATIONS—SUBSOIL.
   State highway engineers who make an extended preliminary investigation of soil and subsoil conditions on route of new highway have a duty to set forth in the specifications descriptive language which would not mislead a bidder.

3. SAME—SPECIFICATIONS—SUBSOIL—MISLEADING TERMS—FAILURE TO PRESENT INFORMATION COMPREHENSIBLY TO BIDDERS—EVIDENCE.
   Finding of trial court that plans and specifications for proposed highway over new route contained terms as to subsoil that would mislead an average road contractor and did mislead plaintiff, although there was no intent to do so, and that officers and employees of highway department did not furnish all available information as to subsoils in a form and manner that would apprise prospective bidders of the difficulties to be encountered and which resulted in additional cost to do work not clearly indicated on the plans *held*, sustained by the preponderance of the evidence.

4. APPEAL AND ERROR—COURT OF CLAIMS—FINDINGS OF FACT.
   On appeal from court of claims the Supreme Court attaches to the findings of fact by the court of claims an importance similar to findings of fact by a circuit judge in a law case where trial by jury has been waived (Act No. 135, §§ 9, 15, Pub. Acts 1939, as amended by Act No. 237, Pub. Acts 1943).

NORTH, WIEST, and BOYLES, JJ., dissenting.

Appeal from Court of Claims; Arch (Charles O.), J., presiding. Submitted January 11, 1945. (Docket No. 9, Calendar No. 42,853.) Decided April 9, 1945.

Claim by W. H. Knapp Company, a Michigan corporation, against State of Michigan and State Highway Department for extra work caused by misrepresentation in specifications for road contract. Judgment for plaintiff. Defendants appeal. Affirmed.

*Shields, Ballard, Jennings & Taber,* for plaintiff.

*John R. Dethmers,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Meredith H. Doyle* and *A. Floyd Blakeslee,* Assistants Attorney General, for defendant.

REID, J. This is an appeal by defendants from an order of the court of claims allowing $64,962.41 as the balance due plaintiff because of the construction of 7.532 miles of highway grading and drainage structures in Chippewa and Mackinac counties. On January 4, 1939, the State highway department advertised for proposals concerning this project, the proposals to be opened at 10 a.m., January 18, 1939, at Escanaba, which advertisement came to the notice of Mr. Knapp, officer and agent of plaintiff, on January 7, 1939. As soon as practicable, he made a trip to the site of the project, which was to be a new highway through wooded territory, and spent a part of two days observing the territory involved. At that time the trees had been cut down and the ground was covered with a foot of snow. Mr. Knapp noted the top of the surface soil and ob-

served numerous large boulders protruding through the snow, found some of the pits which the employees of the State had made to ascertain soil conditions, and noted the soil at the bottom of those pits. Plaintiff made a bid, received a contract, and now claims that it was misled by misrepresentations as to the character of the soil, and found that the construction was more difficult and more expensive because of the difference in the soil conditions between that represented in the plans and specifications submitted by the State and that found in the progress of the work. Plaintiff claims that it encountered indurated material at locations where the specifications indicated loam, and that much of the material it encountered (whether classifiable as indurated or not) was more difficult to excavate than that which was indicated in the specifications.

Plaintiff does not count on tort, hence the doctrine of sovereign immunity does not bar its claim. A discussion of the principle of sovereign immunity as applied to similar facts is to be found in *Hersey Gravel Co.* v. *State Highway Department,* 305 Mich. 333, 339. Plaintiff does not seek to void the contract but claims additional sums because of difficulties in excavation greater than those indicated in the specifications.

Defendants' definition of the issues indicates two questions of fact: 1. Did the soil notations on the plans prepared by the State highway department indicate to an experienced contractor that in excavating this roadway in the upper peninsula he would meet with no difficulties due to indurated materials? 2. Did the plaintiff contractor when excavating this roadway encounter such indurated material as should, under the specifications, have been classified as rock? Defendants submit further a question of law, whether this Court should

reverse a judgment rendered in the court of claims as against the preponderance of evidence under Court Rule No. 64 (1933).

Plaintiff relies on the decision in the *Hersey Case, supra.* Mr. Knapp, acting for plaintiff in this case, found himself in a situation similar to that of plaintiff in the *Hersey Case,* in that by reason of the brevity of time between the notice to bidders and the date for receipt of bids, he was compelled to make a hurried inspection of the route of the proposed highway under unfavorable winter conditions, and to rely on the information given him by the department. The blueprints in the instant case contained a recital warning the bidders to examine the site and not rely on soil notations on the plans, similar to the words used in the blueprints in the *Hersey Case.* In respect to examination of soil conditions plaintiff in this case was not in a situation more favorable to itself than was the plaintiff in the *Hersey Case.*

In 1937 the State caused an examination and survey of the route of the proposed highway, and various borings or pits, to be made, and tests applied to determine the character and nature of the work required. This information was in the office of the State highway commission but was not shown to plaintiff nor set forth in full detail in the specifications. Mr. Herbert Dunsmore, an engineer employed by the State, was asked to make a soil survey of the route of the proposed highway, which he began some time in February, 1937. He testified, in part, that with an assistant he obtained 15 W.P.A. workers on February 15, 1937, and the force worked during part of the remainder of February and part of March, sometimes with 50 laborers; that the force completed a soil survey the same year; that the procedure was to take an inch and a half

soil auger 4 feet long, which could be extended by adding pipe, with which they took borings on the center line of the right of way, usually every 200 feet; at every six inches of boring the auger was pulled out, and operation continued to desired depth; the first thing he did was to investigate the sections where a cut was to be excavated and there they started by digging out a hole about four feet by six feet and two feet deep; sometimes it was then easier to drive down rods or bolts used for construction of boats; that as far as the bolts could be driven they knew there was no ledge rock; that notes indicating on the plans "Detour stony loam," "Eastport sand," et cetera, were sent by the witness to chief soils engineer Matthews, who afterwards walked with witness the entire length of the job.

Mr. Dunsmore testified,

"The term 'loam' only indicates that the soil is made up of material of even parts—sand, silt, and clay. None of those materials are predominant. In other words, it is what we call a uniform mixture which makes a very dense soil and it is the only test."

He further testified that indurated material could be classified as a material that is "metamorphosed" by heat and pressure. He testified further,

"Driving a steel rod into the ground would never give you a soil type, that is for rock soundings; then * * * where I drove a steel rod into the ground, in those cuts, they didn't give me any information as to soil classification. We would take a soil auger and determine the various horizons of soil down for at least three and a half feet. * * * When * * * (the rod) hit a piece of limestone rock it would bend around it and would have to. I left the rod right in there in this bent condition and

they excavated it on the job, I understand.   *   *   *
I knew that below a given depth that there was a
continuous mass of material such as Exhibit 15 as
found in its natural state. Anyone, I suppose, that
was a soils engineer with my training and experi-
ence would know the same thing.   *   *   *   There
was no explanation of that on the plans except to
merely label 'Detour stony loam' or 'sandy loam' or
something of that sort. That was the explanation.
What I mean by that is, if I were remaking this soil
survey, in the light of all the evidence we know
now, I would still call it exactly the same thing
which it is."

Mr. George Foster, who was employed by the
State highway department from 1922 until 1935,
during which period he was, successively, drafts-
man, project engineer, designer, resident engineer,
chief draftsman on bridge design, and assistant
bridge engineer in charge of construction, testified
that he had had available and had made a study of
the plans upon which the bidding was based on the
project in question, and had reviewed them in con-
siderable detail. He further testified in part,

"The plans indicate at station 384 what is termed
'Bergland clay' and farther on in the cut a 'Detour
stony loam.' We found an indurated material con-
taining rock, which was very hard and might be
considered as cemented together, particularly in
the lower portion of the cut. The surfaces and
the surface soil agreed in general with the plan
indication. The surface was either 'Bergland clay'
or 'Detour stony loam' as we got farther along.
In making the excavation for this cut, the contrac-
tor would encounter a different character of ma-
terial than the plans indicate.   *   *   *   Station
402 to station 413, plus 50, was another cut, through
which, from station 410 to 413, plus 50, we have in-
dicated an average of two feet of hard indurated

material containing rock above planned grade line, that was not a uniform two feet but the average would probably be above two feet. The below grade material, or the extra foot which he was required to excavate between those stations. It was all of a hard indurated material similar to that first mentioned. The plans represent that to be Detour stony loam through this. * * * The next cut begins at approximately station 446 and continues through various depths to approximately station 468. Through that area the plans indicated 'Detour stony loam.' We found that the lower portion of the cut from 446 to 453 was a very hard material similar to that previously described as indurated. We found rock between stations 453 and 455 and between stations 459 and 467 we found indurated material again at an average depth of about four feet. The representation was 'Detour stony loam.' I took a sample of that 'Detour stony loam' as I found it on the surface.

"*Q.* I show you Exhibit 18 and ask you if that is that sample of 'Detour stony loam' as you found it there?

"*A.* We consider it as such, yes. * * * We took these samples, this one as well as others, by digging down through the material forming the surface of the cut area. * * * The next cut section applies between approximately station 503 to station 532. Throughout that cut section, the plans indicated 'Detour stony loam' and our investigation, as previously mentioned, indicated a hard indurated material throughout except for the surface material.

"*Q.* When you speak of an 'indurated material' you have in mind that which is referred to in the specifications from which I have just read?

"*A.* Yes. * * * Station 532 was a part of the hard indurated material throughout except for the surface material. Proceeding to 565 to 567, there was indicated on the plans 'Detour loam' and we found very definite evidence of ledge rock

throughout those two stations. Going on further to 585 to 598, there were indications of ledge rock throughout those cuts. That is what we found. The plans indicated 'Eastport sandy soil.'  *  *  * Between stations 610 and 624 the plans indicated rock and 'Detour sandy soil' and in another place 'Detour sandy loam.' There again except for the surface material we found rock and indurated material throughout the slopes of the cut.

"Our next cut section was at stations 638 to 646 where the plans indicated 'Detour loam' and we found rock and indurated material.  *  *  * Between stations 677 and 685, another cut in which the plans indicated 'Detour sandy loam,' we found rock and indurated material. At that point I took a sample of station 680. (Exhibit 17)  *  *  * The next cut is station 737, plus 50, through to the end of the project at station 748. This the plans indicated as 'Emmet loamy sand' and we found many indications or rock cuts through this particular section which was very hard."

Vaughn Blue, a witness for plaintiff and one of the men employed by the contractor to work on this job, testified to the difficulties in detail. His work on the job consisted in looking after the operations of the work for the contractor. Archie Cornell operated a Lorraine shovel and Koehring drag line. He described the difficulty of digging in the material as follows:

"I don't know how to describe that type of digging. The top seemed to be O.K., but when you got down a little ways the only way I could describe this would be that it might be just like concrete. You could get the teeth in it, but it wasn't exactly like rock. It was matted together. It was tough; it wouldn't seem to chisel at all. The teeth would get driven in full distance, but they wouldn't seem to get much dirt. The shovel had a bucket with

teeth on the end around 10 or 12 inches long. There are four of them to a bucket, about 33½ wide. The peculiar thing about a set of teeth was that they couldn't be kept sharp. When they would wear on the bottom we would turn them. It would wear them right out. We cut one side of them off and then we would have to get a new set. On earth excavation, I have used the same set for two or three years. On this particular job on the average they would last maybe a couple of weeks. We would have to build them up or do something about it.''

Remus Frank, who operated the shovels on this job, testified,

''When I was on the P & H I should have been loading 2,000 yards of dirt where I was loading 300 in seven hours. That is, we were working two shifts at that time. Two seven-hour shifts. * * * It's like material that I never saw before. I call it hardpan.''

Mr. Knapp testified,

''I never had operated in the upper peninsula. * * * The first day that I was at the east end, there was a foot of snow, and more in places, on the ground, but you could see the large boulders on the surface very plainly. I had the plans with me and I followed the various balances through to get an idea of the amount of rock and soil conditions as nearly as I could determine from the surface without making any test holes. There wasn't time to dig any test holes. I did find several and they were filled with snow, but we could see rock in the bottom. After we returned home, I started preparing the proposal and I think I worked on it about a day and a half or two days. * * *

''(Q.) Were you familiar with the definition of those soils as shown in the chart, Exhibit 3?

"*A.* Not in a technical way, just as a layman. I never had access to a chart as you have there. I gave it a visual inspection and decided that that Emmet loamy sand was sort of a yellow sand bearing surface boulders. The plan showed surface boulders and they were apparently exposed on the top of Emmet sandy loam. Sand is always desirable to excavate. It is easy to move and not very hard on the equipment. A loam, contains a certain amount of what I call black dirt. It is more of a top soil. It is excavated in the same manner as sand. * * * I took into consideration the kind of material in forming my bid. They could have been easily moved and at a profit had they been as represented. I found quite a few surface boulders throughout this cut area and down for 3 to 4 and sometimes 5 feet. Sort of a loam mixed in with stones which was comparatively easy to move, but underneath and down to the grade was a hard substance which was almost impossible to dig. It required chiseling and 3 or 4 passes with the shovels to get a bucket load and we attempted to blast places to assist in loosening up the material but again we found it hard to dynamite because of the cushion effect of this material and that dynamite would not reach out very far but would blow a hole perhaps two feet in diameter and that is about the only part of the soil that would be affected by the dynamite. Unlike rock, it would not fracture and crack. * * * At station 413 there is a notation 'Detour stony loam;' at station 410 we have the word 'Alpena.' There is no further explanation there. I don't know what they mean by that. They showed 'Detour loamy' and below that 'stony.' I presume they mean 'Detour stony loam.' Those materials are easy to remove efficiently. The plans show here again that the balance point is split up. It starts at 404 and stops at 410, plus 40, approximately. In this area we have a notation 'no ledge rock.' We have rock excavation 11,045 cubic yards.

Excavation 23,296 cubic yards. That does not cover all of the cuts or we would have to go back into the other balance but it covers substantially the bulk of the excavation in this particular. This area which was shown on the map as 'Alpena gravel' is comparatively easy to move. Referring to 402 to approximately 409, but on the east side of this cut, we ran into some very difficult material. Approximately 409 to 413 plus 50, there were boulders loose on the surface. Down for a depth of 3 to 4 feet it was Detour loam. We had no difficulty with it, but down underneath we ran into this indurated material and small boulders, very hard to move, and the soil engineer classed that unsuitable material for pavement and had us dig below grade in order to replace with suitable material. * * * It was indurated hard material, with small boulders. It required a lot of chiseling and some dynamiting. Exhibits 15, 16 and 17 are typical of what we found in the lower sections of this cut in one solid continuous mass. 388 to 389 we have a notation, 'Detour stony loam,' and 'no ledge rock' indicated on the plans. Again we go back to station 369. The plan shows rock excavation 355 cubic yards. Excavation 16,728 cubic yards with a notation '10 per cent. boulders one-half cubic yard to one cubic foot. 15 per cent. boulders one cubic foot to three inches in diameter and 75 per cent. earth excavation.' I took all that into consideration in formulating my bid. Had that material been found, I could have removed it profitably. * * * Underneath the boulders we found so-called 'Detour loam.' Until we got down about 3 and 4 feet below the surface, we ran into this hard material which we call indurated and again we were required to chisel and blast. After we had this cut removed, the soils engineer decided the material in the grade would not be suitable for paving. So we were required to go back and dig out throughout this area one foot below grade. * * * The rock that overrun we were not paid for ever, but we were not paid for

overrun. This one foot * * * was all rock in there—all indurated material for a distance of 50 feet. That would be station 384, or in that vicinity. The indurated material that we found in the lower part of that cut was the same as exhibits 15, 16 and 17, a solid mass in place. That would be continuous from one end of the cut to the other and to a depth as far down as we excavated. This particular cut would vary from 3 to 6 feet. The paid rock overran the rock as shown on exhibit 2, the plan, approximately 154 per cent. * * *

"(Q.) Over and above the amount of rock that was paid for, in your best estimate and judgment what was the excess?

"A. I would have to roughly say around 40,000 yards of the indurated material. That wasn't paid for as rock. We were paid for it, however, as earth excavation at the rate of 18 and 20¢ per yard."

Much testimony was also given concerning indurated material by several witnesses who had to do with the actual construction. Francis J. Hagan, witness for defendants, who was employed on the project as a district soils engineer, attributed the difficulty in shoveling to stones or pebbles in the material. He testified,

"I have identified exhibit 17 as not being indurated material. In this material there is a presence of small rocks and these are bound together in some degree by a sort of a clay substance. If that were bound together to several other small stones by this clayish substance that would not be an indurated material."

Albert E. Matthews, soils engineer with the highway department, defined indurated material as,

"Material that has been hardened as great heat indicates, and indurated clay. It also refers to material that has been cemented by chemical action.

Exhibits 15, 16, 17 and 18 are not indurated materials.''

Stanley L. Hannon, witness for defendants and project engineer for the department, with which he has been since 1935, testified,

''I am familiar with exhibits 15, 16 and 17 and 18. I found material such as that in the bottom. I don't think I am any judge to say whether it is indurated or not. It did not require blasting.    *    *    *

''Q. Did you observe the action of the shovel in the cut where it struck material similar to exhibits 15 to 18, inclusive?

''A. I will have to agree as everybody else has that it was a tough job to excavate. However, a great deal of the reason for the shovel coming up with a half bite, as you might call it, or a half dipperful, wasn't always due to the fact that there was hard material down there, rock and so on and so forth—and even loose rocks had fallen down—that would get in front of the teeth in between the bank of the face of the cut and the teeth and thereby your teeth had no effect on the dirt itself. Therefore, you wouldn't get a load every time you brought up the bucket.

''Q. How did the teeth of the bucket or shovel appear to act in that stuff when it wasn't interfered with by other rocks?

''A. There sometimes had been pretty hard digging for them, but it would gouge into it all right and break it up.

''Q. As it is being uncovered and taken out, did it have any different appearance then and after it had?

''A. It certainly did if it rained on it. It would soon break down.

''Q. How did it act when it got rained on?

''A. Turned to soup and mud and impossible to haul on; really mirey, like clay, slippery.''

Edmond Carmody, an engineer for the State highway department, a witness for defendants, testified he did not see any evidence of indurated material on the job, and further,

"When I got onto the job I found that he was having a tough time. It was difficult digging and it was hard on the machinery. His operations were very slow and that was all due to the kind of material that he was working and equipment. At that time this job had been going forward for about 11 months, I should say. He had been using his equipment in this tough material for a year—not all of the equipment, some of it. I would say all of the shovels. * * * He used his trucks and bulldozers. After a year of working in this kind of material it was not logical to expect that that machinery would fail if he kept it in repair."

We note that engineers who were witnesses for the State also speak of plaintiff's excavation job as "tough."

It seems to us clear that there was a material encountered by the contractor in the several cuts on this job in great quantity that was far more difficult to handle than material which could properly be called loam or sand. The words employed by the engineers for the State in making up the specifications did not reveal to plaintiff nor would they reveal to the mind of the ordinary contractor in preparing his bid or signing a contract that so much material so difficult to remove would be encountered. We can heartily commend the engineers for their willingness to make a good bargain for the State, but their duty called upon them to set forth in the specifications descriptive language which would not mislead a bidder. Mr. Knapp for plaintiff company was misled by the specifications.

The trial court relied upon the majority opinion in the *Hersey Case, supra.* That opinion is controlling in the instant case as to the duty of the State in preparing its specifications and, resulting liability where the contractor was misled. Most of the issues involved in that case are similar to the issues in the instant case.

The trial court found that, while there was no intent on the part of the State through its officers and employees to wilfully mislead any bidder, to the average road contractor the technical phrases upon the plans would not indicate what might come to the mind of a soils engineer; that it was the duty of defendants to indicate plainly the necessary information on the plans and that the information supplied was of such a nature that only a highly trained, experienced soils engineer would have placed the interpretation on it that defendants claim; that defendants did not furnish all the available information on the subject of subsoil in a form and in a manner that would apprise the prospective bidder of the difficulties to be encountered and in terms that would readily be understood by the average road contractor. The trial court further found that the contractor was required at additional cost to do work not clearly indicated on the plans and specifications.

We quote the following from the opinion of the trial court:

"The court concludes that the State highway department had information at hand relative to the nature and composition of the subsoil which it neglected to furnish the bidders upon this project; and that the information supplied was of such a nature that only a highly trained expert in soil engineering would have placed the interpretation thereon that

defendant claims it was entitled to. The court finds it was the clear legal duty of the department to furnish all the available information on this subject in a form and in a manner that would apprise the prospective bidders of the nature of the difficulties to be encountered and in terms that would be readily understood by the average road contractor. Under the record I find that it has not done this and that claimant is entitled to an award of damages. * * * The court finds the sum of $32,971.46, being the cost of excavation over and above the amount allowed by the State, to be a reasonable amount for this item and it is therefore allowed in full.

"The court further finds that the item of $25,469.64 as rental on equipment is reasonable and should be allowed in full. I have examined the individual items making up this claim and while one or two items would appear too high, a further study shows them to be of a minor nature. Several of the larger items are very conservative. On the whole I find this section of the claim very reasonable. * * * The item of stone pickup and haul is denied for the reason that the contractor could have reasonably anticipated this work and should have taken it into consideration in making a proposal on these projects or on any other project for that matter, where it would be a subject of more or less importance. (See sections 2.11.01–2.11.03 State highway department standard specifications.) * * * The item regarding the exclusion of plain riprap strikes me as having merit for the reason that it was eliminated entirely, thus exceeding the percentage of tolerance allowed. 40¢ per square yard profit is reasonable and therefore is allowed in the amount of $677.20.

"Claimant may take judgment against the defendant, State highway department, in the amount of $64,962.41, composed of the following items:

"Balance of reasonable costs to
 claimant above amount paid by
 State highway department ..... $32,971.46
 Rental and maintenance of equip-
  ment ........................ 25,469.64
 10% profit on above items........ 5,844.11
 Profit on eliminated plain riprap.. 677.20
                                   $64,962.41"

On appeal we attach to the findings of fact by
the court of claims an importance similar to the
findings of fact by a circuit judge in a law case
where trial by jury was waived: Act No. 135, §§ 9,
15, Pub. Acts 1939, as amended by Act No. 237, Pub.
Acts 1943 (Comp. Laws Supp. 1940, 1943, § § 13862–
9, 13862–15, Stat. Ann. 1944 Cum. Supp. §§ 27.3548
[9], 27.3548 [15]). In the instant case the
findings by the trial court are not against the pre-
ponderance of evidence. We further find the pre-
ponderance of evidence in favor of plaintiff.

The judgment appealed from is affirmed, with
costs to plaintiff.

Starr, C. J., and Butzel, Bushnell, and Sharpe,
JJ., concurred with Reid, J.

North, J. (*dissenting*). I cannot agree in affirm-
ance of the judgment entered in the court of claims.
Were it not for the serious consequences which fol-
low, some of which are hereinafter noted, I would be
disposed to acquiesce in the conclusion reached by
Mr. Justice Reid on the ground that this case is con-
trolled by the majority opinion in *Hersey Gravel Co.*
v. *State Highway Department*, 305 Mich. 333. The
factual background, at least in a general way, and
the law issues involved are the same in the instant
case as those before the Court in the *Hersey Gravel
Company Case.* But I have an abiding conviction

that the result reached by the majority of the Court in the *Hersey Gravel Case* was erroneous; and notwithstanding the dissenting opinion of Chief Justice BOYLES in that case is quite applicable to the instant case, I am constrained to add the following.

Two important features of this record should not be ignored. (1) The trial judge's finding, amply supported by the record, is to the effect that defendants herein were not guilty of fraud or deceit. And (2) the plans and specifications incident to the construction of this highway were furnished by the State and known to plaintiff before it entered into the contract to construct the same for an agreed consideration.

Plaintiff's contract required it to complete this project: "in strict accordance with the plans, specifications and proposal therefor." The proposal recites that the contractor agrees: "To complete the work herein described in strict accordance with the plans therefor and in strict conformity with the requirements of the 1934 Standard Specifications for Road and Bridge Construction of the Michigan State Highway Department. The Standard Specifications contain the following:

"Bidders shall carefully examine the proposal, plans, specifications and supplemental specifications *and inspect the site of the proposed work in order to satisfy themselves, by examination, as to all local conditions affecting the contract.*"

Further, there plainly appears upon the plans which constituted the basis of plaintiff's bid the following:

"SOIL NOTATIONS

"Soil notations shown on the plans are for information only and shall not be considered to relieve bidders of the responsibility to satisfy themselves,

by examining the site of the proposed work, as to the actual soil conditions.''

Plaintiff's claim of right to recover is upon the theory that it was misled by the notations on the plans as to soil conditions, and it would have the Court shut its eyes to the above-quoted provision embodied in the same plans. Such a position is wholly untenable.

Not only was plaintiff as a prospective bidder on this project warned by the above-quoted provision in the plans which were the basis of its bid, but obviously it knew that it was burdened with ascertaining soil conditions through its own efforts as the result of which it actually made a personal investigation of such conditions prior to submitting its bid. If under the circumstances of this case the State is not protected by the terms of the contract, the obvious result is that the State is deprived of its right to make a contract of this character which is binding upon the opposite party thereto. And further, it deprives the State of the benefit of seeking competitive bids for such undertakings, if it is to be held that the lowest bidder, having eliminated the other bidders and having obtained the contract, can be relieved of his contract obligation in the event that unanticipated difficult conditions are encountered.

Under the heading ''Unanticipated Difficulty,'' the Restatement of the Law on Contracts contains the following:

''Facts existing when a bargain is made or occurring thereafter making performance of a promise more difficult or expensive than the parties anticipate, do not prevent a duty from arising nor discharge a duty that has arisen.'' 2 Restatement of the Law, Contracts, § 467.

While clarification of the foregoing proposition seems quite unnecessary, the first illustration given in the Restatement in connection with the above quotation is as follows:

"A contracts with B to erect a building on a certain lot. A finds on starting performance that it is unexpectedly expensive to lay the foundation as he contracted. He does so, however, and partially erects the building when it is destroyed by an earthquake that destroys the foundation as well as the partially erected building. A's duty is not discharged."

Further, the plaintiff in this case ought not to profit at the expense of the State by its contention that because it was somewhat unskilled in its line of activity it did not fully understand the meaning of the "Soil Notations" indorsement upon the plans. Nor should plaintiff, after having bound itself by the terms of the contract, be now heard to say that the time intervening between the first publication for competitive bids and the date for submitting such bids was too brief to enable it to make a thorough investigation of the details of the work it contracted to perform. When plaintiff signed the contract the extent of investigation made by it was known to it and was solely a matter of its responsibility.

Under the findings of the trial court plaintiff is not entitled to recover. We quote the following from such findings:

"Being somewhat familiar with the vicinity in which the road was to be built, * * * (Knapp) became interested in the job. * * * After studying the plans and specifications he made a trip to the site of the job and spent a part of two days observing the territory through which the projects extended. * * *

"This action is planted on the theory of breach
of warranty and breach of contract. * * * The
Court was impressed that the State highway de-
partment had considerable information as to subsoil
matters which, in violation of its duty, it neglected
to make available in unmistakable clear-cut terms
to those it was asking to bid upon the project.
* * * However, I was equally impressed that
there was no intent to wilfully mislead any bidder.
There was not a scintilla of evidence tending to
show bad faith on the part of defendant's em-
ployees. * * * Nevertheless they were mis-
taken in the legal duty resting upon their shoulders.
* * *

"Engineers from the department evidenced no
surprise at the difficulties encountered by the Knapp
Company and say in substance that the conditions
described by claimant would be exactly what they
would expect from the soil notations. * * *
"The court finds it was the clear legal duty of the
department to furnish all the available information
on this subject in a form and in a manner that
would appraise [apprise?] the prospective bidders
of the nature of the difficulties to be encountered
and in terms that would be readily understood by
the average road contractor."

The trial court's fundamental error is in the con-
clusion last above quoted. These parties were deal-
ing at arm's length incident to a project which all
parties knew required skill in its performance. The
State should not be penalized on the ground that
plaintiff was not sufficiently skilled (as it now
claims) to understand the technical notations on the
plans and specifications as to soil notations. This
record cannot be construed to sustain a conclusion
that defendants or their employees were guilty of
fraudulent concealment of any known fact which
they were in duty bound to convey to prospective

bidders. The trial court's decision in this respect was in error. This is true both because of the fact that these parties were dealing at arm's length, and especially because of the fact that the plans bore the notation hereinbefore quoted that:

"Soil notations shown on the plans are for information only and shall not be considered to relieve bidders of the responsibility to satisfy themselves, by examining the site of the proposed work, as to the actual soil conditions."

And further, as above noted, there was embodied in plaintiff's contract the provision of the standard specifications of the Michigan State highway department:

"Bidders shall carefully examine the proposal, plans, * * * and inspect the site of the proposed work in order to satisfy themselves, by examination, as to all local conditions affecting the contract."

As quoted above from the court's opinion: "This action is planted on the theory of breach of warranty and breach of contract." Careful review of this record fails to disclose testimony from which it can be concluded that there was any warranty in the contract or any other phase of the contract which was breached by defendants. Plaintiff does not contend, nor could it, that it is entitled to recover against the State or its agencies in tort. This is true because of the State's nonliability in that type of action on the ground of sovereign immunity. In its legal aspect the instant case is in the same field and should be controlled by our decision in *Atletwed* v. *City of Marysville,* 295 Mich. 102, wherein the plaintiff contractor was denied right of recovery.

The judgment entered in the court of claims should be reversed without a new trial and with costs of both courts to defendants.

WIEST and BOYLES, JJ., concurred with NORTH, J.