PAT J. MURPHY, INC., Plaintiff,

v.

DRUMMOND DOLOMITE, INC., Defendant,

v.

AMERICAN EMPLOYERS INSURANCE COMPANY, a corporation, Cross-Defendant.

No. 60–C–191.

United States District Court
E. D. Wisconsin.
Aug. 13, 1964.

O. S. Hoebreck, Milwaukee, Wis., for plaintiff, Grootemaat, Cook & Franke, Milwaukee, Wis., of counsel.

Malcolm K. Whyte, Victor M. Harding and Martin R. Browning, Milwaukee, Wis., Robert L. Rohde, Sheboygan, Wis., for defendant, Federer, Grote, Hesslink, Rohde & Neuses, Sheboygan, Wis., Whyte, Hirschboeck, Minahan, Harding & Harland, Milwaukee, Wis., of counsel.

James P. Brody, Gilbert W. Church and Foley, Sammond & Lardner, Milwaukee, Wis., for cross-defendant.

GRUBB, District Judge.

This is an action to recover damages for losses sustained in the construction of a road on Drummond Island, Michigan. Jurisdiction of the cause is based on diversity of citizenship of the parties. The prior decision rendered herein is hereby incorporated by reference.

Plaintiff, Pat J. Murphy, Inc. (hereinafter called the "Contractor"), is a Wisconsin corporation engaged in the excavating business. The president of the Contractor is Patrick J. Murphy, Sr., who was in active management and control of the business at all times concerned in this litigation. During all of said period Patrick J. Murphy, Jr., was its vice president. Defendant, Drummond Dolomite, Inc. (hereinafter called the "Owner"), is a Delaware corporation engaged in quarrying dolomite on Drummond Island, Michigan (hereinafter called "Island"). The Owner has its executive offices in Sheboygan, Wisconsin. Cross-defendant, American Employers Insurance Company (hereinafter called "Surety"), a Massachusetts corporation, wrote the Contractor's performance bond.

This court, in its prior decision on severed legal issues of March 7, 1963, in Pat J. Murphy, Inc. v. Drummond Dolomite, Inc., D.C., 214 F.Supp. 496, held, among other rulings, that the law of Michigan was controlling as to the substantive rights of the parties. Trial of the case was to the court.

*Background*

The Owner has mined dolomite on the Island since 1945. The Island is located in Lake Huron, just offshore from De-Tour, Michigan. Prior to 1959, the Owner's quarry and its facilities for milling and loading limestone for shipment on boats were located at the extreme west end of the Island. By 1956, it became apparent that the deposit at the existing quarry would shortly become exhausted. The Owner undertook the investigation of other parts of the Island to locate another commercially usable deposit. The search involved a program of core drilling to determine the depth and quality of the dolomite deposits.

In April 1958, the Owner engaged Walter H. Knapp of Wisconsin, Inc. (hereinafter called the "Engineer"), to make a survey and layout of a haul road connecting its new quarry site with the existing milling and shipping facilities and to prepare the plans and specifications for letting the road construction contract. Robert Glynn, the vice president of the Engineer, was in active charge of the haul road project.

In December 1958, Glynn showed Murphy, Sr., the plans and specifications for the haul road he was then preparing at the Engineer's office in Milwaukee, Wisconsin. Murphy suggested that a provision be inserted to the effect that the work was to be performed in accordance with the Wisconsin State Highway Commission Specifications. Early in January 1959, Glynn advised the Contractor that the bid specifications were available. Pertinent provisions of the haul road contract specifications and of the *Standard Specifications for Road and Bridge Construction,* Edition of 1957, of the State Highway Commission of Wisconsin (hereinafter referred to as the "Wisconsin Specifications"), are as follows:

"14. *SPECIFICATIONS*

"The following detailed specifications will apply to various items of work necessary for the completed project. In general, all of the work is to be done in accordance with standard specifications of the State Highway Commission of Wisconsin, for Road and Bridge Construction, except as otherwise specifically noted."

"*EARTH WORK*

"Work included under this item will consist of furnishing all plant, labor, supervision, equipment and supplies necessary to perform all operations in connection with the earth work, complete, and is to include all marsh excavation, common excavation, embankment, placing of select granular sub-base course, finished roadbed section, embankment slopes and cut ditches, all to conform to the elevations and grade lines indicated on the drawings."

"*MARSH EXCAVATION*

"Work under this item is to consist of excavating and disposing of all unstable ground, peat and muck within the limits of the roadbed section or other locations, and disposing of in dump areas, all as directed by the Owners' Engineer. Payment for this item will be made at the unit bid price per cubic yard of marsh excavation."

"*COMMON EXCAVATION*

"Excavate to the lines, elevations and dimensions indicated on the applicable drawings. The work included under this item includes the portion west of the Town Line Road at Point A, to Station 240 plus 50, in addition to portion indicated as Line A–B, as shown on Drawing No. 109–58. Suitable excavated materials shall be used in the construction of roadway embankments. Top soil is to be salvaged from excavated areas and stock piled, to be applied later to the slopes for seeding. The excess material and the unsuitable material shall be disposed of as directed by the Owners' Engineer. Embankment slopes and ditches must be maintained to the lines and grades

as indicated on the drawings. Proper drainage of the roadway and ditches shall be maintained during construction. Boulders or rock fragments will be classified as common excavation under this item, and no additional payment will be made for their removal over and above the unit bid price for common excavation. Indications are that there will be no solid rock or ledge rock encountered in the excavated areas. No provision for unit price shall be made for removal of such. However, if solid or ledge rock is encountered during the progress of the work, the Owners and Owners' Engineer will negotiate with the contractor for its removal.

"If undesirable foundation material is encountered at the sub-grade elevation, such as water-bearing soil or non-porous clay, the contractor, at the direction of the Owners' Engineer, shall excavate and remove the material so as to provide a depth of 21″ of granular sub-base material. In these areas the contractor shall, at the direction of the Owners' Engineer, furnish and place 10″ diameter, perforated, corrugated 16-gauge iron pipe parallel to and below the ditch line as shown on the detailed drawings.

"It is the intent of these specifications to provide for 21″ of granular sub-base material in both excavations and embankments. It is anticipated that the common excavation will contain materials suitable for use in the 21″ granular sub-base.

"Payment for the above item of common excavation including any possible necessary undercutting, will be made at the unit bid price for common excavation. Payment for any possible necessary 10″ diameter pipe will be made at the unit bid price of the Alternate #3."

"2106.02 *Classification.* (a) *General.* Roadway and Drainage Excavation will be classified as Common Excavation, Rock Excavation, Stone Piles and Stone Fences, Marsh Excavation or Unclassified Excavation as hereinafter described. The classification of material as between Common Excavation or Rock Excavation will be based on the material in an unfrozen condition.

"The classification of Roadway and Drainage Excavation as Common Excavation or Rock Excavation will be determined by the engineer as the work is opened up and performed. From time to time as the work progresses and at least once each month, the engineer will, in writing, notify the contractor or his authorized representative on the work of the amount or the limits which will determine the amount of material to be classified as Rock Excavation. If the engineer's classification of the portion of the work thus allowed, and covered by such notification, is not protested in writing by the contractor within 15 days after the date of such notification, the contractor agrees to waive his right to any claim to any change in classification for such portion of the work involved in such notice.

\*    \*    \*    \*    \*    \*

"(b) *Common Excavation.* Common Excavation shall consist of the removal and satisfactory disposal of all materials of every description not otherwise classified under the specifications for Roadway and Drainage Excavation.

"(c) *Rock Excavation.* Rock Excavation shall include all hard, solid rock in ledges, bedded deposits and unstratified masses and all conglomerate deposits or any other material so firmly cemented as to present all the characteristics of solid rock; which material is so hard or so firmly cemented that in the opinion of the engineer it is not practical to excavate and remove same with a power shovel except after thorough and continuous drilling and blasting. Rock excavation shall also include all rock boulders necessary to be re-

moved having a volume of ½ cubic yard (13½ cubic feet) or more.

"The classification of Rock Excavation shall not apply to plain or bituminous bound bases or surface courses of macadam, gravel, or broken stone, and such materials will be classified as Common Excavation.

"Power shovels as referred to above shall be taken to apply to a modern power shovel of not less than three-quarters cubic yard manufacturer's rated capacity, having adequate power and being in good running condition in the hands of an experienced operator."

The Wisconsin Specifications also contain this provision:

"1109.09 *Disputed Claims for Extra Compensation.* In any case where the contractor shall claim that extra compensation, or an adjustment in unit prices, is due him for work or material not clearly covered in the contract, or for which an adjustment is not provided in the specifications, the contractor shall notify the engineer in writing of his intention to make such claim, before he begins the work on which he bases the claim. If such notification is not given and the engineer is not afforded facilities for keeping strict account of actual cost as defined for force account construction, then the contractor hereby agrees to waive the claim for extra compensation, or adjustment in unit prices, for such work. Such notice from the contractor, or the fact that the engineer has kept account of the cost as aforesaid, shall not be construed as proving the validity of the claim. The determination of the validity of the claim, and the adjudication and the disposal thereof shall rest solely with the Commission."

The total estimated quantity for common excavation, as stated in the invitation for bids, was 489,000 cubic yards. The deadline for sealed bids was January 29, 1959.

Murphy, Sr., and Murphy, Jr., paid a visit to the Island on January 20, 1959. There, Arvin Mueller, a resident engineer of the Owner, took them on a tour of various points along and near the haul road right of way and of an area of the old quarry site from which could be observed a bank of 15 to 17 feet high face of material standing above the solid rock, identified as the "East Face."

The Contractor submitted its bid by the January 29, 1959, deadline. The bid included a price of 42 cents per cubic yard for common excavation. The bid was accepted by the Owner. Completion date under the contract was October 20, 1959. A performance bond for the Contractor was executed by the Surety.

Before formalization of the contract dated May 5, 1959, the Contractor began clearing and grubbing work on the haul road site. During this period it became apparent that solid rock would be encountered. The Owner and the Contractor thereafter agreed to an amendment to the contract providing for payment of $1.75 per cubic yard for solid or ledge rock and of $2.55 per cubic yard for outcropping or scattered rock or large boulders over one-half cubic yard in size.

Actual excavation work on the haul road began on or about May 15, 1959, in the so-called Ellis cut. After removal of about a foot and a half of topsoil and weathered earth, a certain hard material was encountered. Murphy, Sr., on a visit to the Island in late May, brought the matter of the hard material to the attention of Arvin Mueller. In early June 1959, he informed Glynn about the hard material and told him he would have to get additional compensation for its excavation.

In a memorandum dated June 1, 1959, of a meeting on the Island attended by C. G. Knoblock, the Owner's superintendent on the Island, Arvin Mueller, Robert Glynn, and Hal Ruth, the Engineer's resident engineer on the Island, it was noted that it was then evident that it was very unlikely that granular material would be encountered in the cut sections and that present operations had exposed "a very

hard water bearing clay requiring the use of a ripper before excavation can be done."

After several meetings between the Contractor and Glynn concerning the nature of the hard material and the compensation to be paid for its excavation, Glynn conferred with Knoblock on or about July 7, 1959, on the Island concerning an increase in the common excavation price.

On July 21, 1959, the Contractor met with officials of the Owner. It was suggested that the Contractor prepare figures as to the cost of moving the material and meet with the Owner the next day.

The Murphys, together with Glynn and Ruth, prepared figures showing a cost of 80 cents per cubic yard for excavation of the hard material and presented them to the Owner the following day. The Owner advised the Contractor that the Owner's officials would have a meeting and advise later as to what the Owner would do with respect to an adjustment in the price. The Owner requested the Contractor to continue the excavation.

The Contractor continued the excavation and encountered the hard material in all of the cuts by August 7, 1959.

Early in August, Glynn requested from the attorney for the Engineer an opinion as to whether or not he was obligated under the contract to consider the Wisconsin Specifications in classifying material excavated by the Contractor on the haul road. The attorney, in an opinion dated August 7, 1959, a copy which was mailed to the Owner, advised Glynn that the Wisconsin Specifications would apply because the bid specifications did not specifically cover the question presented.

At a meeting on August 7, 1959, the Contractor informed the Owner that the hard material was not common excavation and that excavation of the hard material should be compensated for at the rock price. The Contractor agreed, however, to stand by the 80 cent offer made in July. The Owner told the Contractor to keep on working and that it would have another meeting.

At this time, R. L. Miller, the Owner's executive vice president, turned over to Glynn excerpts from several treatises on geology dealing with the classification of earth materials.

On August 13, 1959, Miller, in company with Otto Rollman, a highway engineer engaged by the Owner, made an investigation on the Island concerning the classification and excavatability of the hard material. Rollman submitted a report, stating his belief that the classification had been done in accordance with the contract specifications and that there could be a difference of opinion whether scrapers or shovels should be used for excavating the material.

By letter of August 15, 1959, Glynn informed the Contractor that the Owner refused the request for an increase in the unit price for common excavation and cautioned that the Owner would exercise its legal rights should the Contractor fail to complete the project in accordance with the terms of the contract.

Under date of September 3, 1959, the Contractor wrote the Engineer that it was notifying said company and the Owner that it was proceeding under the contract under protest and that it expected to be compensated for past and future excavation at the rock price.

By letter dated September 8, 1959, the Contractor's attorney advised the Engineer that the Contractor was therewith making formal demand for reclassification from common excavation to rock excavation with the increased price of $1.75 per cubic yard and requesting a waiver of the contract completion time. The letter further informed the Owner that the Contractor had arranged for a ¾ yard shovel test on the Island on September 14, 1959. Glynn and the attorney for the Owner responded separately, each advising that the contract alone governed and rejecting the test as having no validity.

The Contractor proceeded with the test which was observed by officials of the

Owner, a representative of the Surety, the Contractor, and others.

Thereafter, as a result of settlement negotiations, the Owner provided drilling and blasting services to the Contractor. The Owner closed its operations, including repair facilities, on the Island on January 21, 1960. The Contractor shut down operations on February 12, 1960. In a letter dated March 30, 1960, the Contractor informed the Owner that unless satisfactory settlement of its claims was made promptly, it would discontinue operations on the Island. Under date of April 12, 1960, the Owner informed the Contractor that all proposals heretofore submitted by the Owner were withdrawn, that the Owner would complete the work, and that the Contractor should remove its equipment from the Island not later than June 1, 1960.

During the performance by the Contractor on the haul road construction project, the Engineer made monthly calculations, called "estimates," of the progress of the work for payment purposes. Copies of these were furnished to the Contractor and to the Owner. The Engineer classified all excavation in the cut sections in one of two classifications— outcropping scattered rock or large boulders and common excavation—until December 1959 when a rock excavation category was shown. The Contractor excavated a total of 389,125 cubic yards of material classified as common excavation.

All monthly estimates prepared by the Engineer were paid by the Owner with the exception of the sum of $58,655.00 withheld according to the terms of the contract.

The Owner then contracted with Bark River Construction Company for the further excavation of the haul road and, together with said company and with its own employees and equipment, completed the construction of the haul road about October 1, 1960.

*Issues*

Plaintiff and cross-defendant contend that the Contractor is entitled to damages for breach of the Owner's duties, under Michigan law of implied warranty and fraud, for failure to disclose the extraordinary nature of the material encountered in the haul road excavation and for misrepresenting the nature thereof. They further contend, in the alternative, that the Contractor is entitled to recover damages under the contract count, either in the amount of the rock unit price of $1.75 per cubic yard for excavation of the hard material or in the amount of the reasonable value of services rendered and materials furnished in respect to said excavation. The Owner has raised the defense of waiver to the fraud claim and has counterclaimed against the Contractor and cross-claimed against the Surety for damages in the amount of excess-over-contract costs incurred by it in the completion of the haul road.

The issues raised by the parties require determinations of factual questions as to the following subjects:

1. The nature of the hard material.

2. The Owner's knowledge concerning the hard material.

3. The nature of the Owner's disclosures and representations to the Contractor.

4. The Contractor's conduct in relying on the Owner's representations and in asserting the claim of fraud.

5. Classification of the hard material under the contract and construction of the contract for purposes of determining the intended excavation compensation for the hard material.

6. Computation of damages claimed by the parties.

1. *The Nature of the Hard Material*

The hard material encountered by the Contractor in the excavation of the cut sections of the haul road after removal of the topsoil has been identified variously as till, glacial till, clay, and, more particularly, as basal till. It consists of unstratified earth and rock materials such as particles of silt, pebbles, clay, sand, and boulders.

The material that presented the greatest difficulty in excavation is of a bluish-gray color. It may be overlined by

brownish granular material. It is extremely dense. Its average mass unit weight in its natural state, based on samples obtained from the haul road right of way, ranges from 145.5 to 156.8 pounds per cubic foot as compared with the weight of concrete of 144 pounds per cubic foot.

The material has been characterized generally as "hard." Hardness has the meaning of induration; that is, a compaction of the constituent particles into a hard mass by such agencies as heat, pressure, or cementation. A well qualified geologist, Dr. Arthur B. Cleaves, who was familiar with the material by inspection and by laboratory testing, explained that the presence of mineral clays of microscopic proportions was a factor in the formation of the cementation or bonding of the constituent particles of the material.

Weathering will destroy the bond or cement of the material and cause it to turn a buff and brownish color if iron is present. It then takes on the appearance of loose sand and gravel with boulders in it. After some weathering, a bank of the material, such as the East Face of the old quarry, gives the appearance of ordinary clay. Its appearance does not indicate the density or cementation of the material.

In its natural state the material is highly impermeable to water. A bank of the material will remain standing in a relatively perpendicular position without sliding or crumbling. In a disturbed state, on addition of water, the material, when broken up by manipulation, such as mechanical excavation, turns slippery and mushy and will tend to flow like wet concrete.

The hard material appears to have been encountered but rarely. Material of similar characteristics has been observed in the excavation of the St. Lawrence Seaway construction and in spots in cut sections of Highway M–134 near DeTour, Michigan, across the channel from the Island. Descriptions of the material encountered in W. H. Knapp Co. v. State Highway Dept., 311 Mich. 186, 18 N.W. 2d 421 (1945), indicate that the material may also be found in other parts of Chippewa and Mackinac Counties in the State of Michigan.

On the Island the material was encountered by the Contractor in the cut sections of the haul road right of way. The bank of material identified as the East Face of the old quarry contains similar material. It has also been met with in stripping operations for quarrying purposes on the Island.

The parties offered samples of the material obtained at designated locations on the haul road right-of-way embankments in a manner directed by their respective expert witnesses. Plaintiff and cross-defendant's sample (Plaintiff's Exhibit No. 254) is in chunk form, showing a mass of undisturbed material, approximately 7 x 6 x 4 inches in size, and is of bluish-gray color. It is a portion of a sample approximately one cubic foot in size removed by use of a 1½ yard shovel. No steps were taken to preserve the moisture content of the original specimen, and it appears in a dried out state.

The Owner's samples range in color from brown to buff to light brown-gray. The original specimens were removed from the embankment by use of a tractor-mounted backhoe and were prepared by coning and quartering which broke up and thoroughly mixed the material. The Owner's samples have been characterized as almost all sand and as not having the characteristics of clay.

The court finds that the sample of material submitted by the Contractor is representative of the hard material encountered in the excavation of the haul road.

Officials of the Owner characterized the hard material as "difficult to dig" and requiring the use of dynamite in spots and as "difficult to penetrate and excavate." Glynn believed that it was harder than any clay he had ever seen. These characterizations were corroborated in considerably stronger language by witnesses who actually performed or observed the excavation or moving of the material. The Owner's samples are not consistent with the testimony of its employees.

The Contractor undertook the excavation by scraper operation because of the contour of the land and the length of the hauls. It was found that the material required ripping before it could be moved by scraper. In the ripping operation it became necessary to use one in place of the customary three points mounted on the back of a tractor. This permitted the exertion of some 15 tons of pressure on the single point of the ripper. Under these circumstances the Contractor, on occasion, achieved only 5 to 8 inches of penetration, although possible penetration of a 42-inch ripper point is 30 inches. The ripper points became hot and had to be replaced as often as three or four times in one day.

In attempting to move the material by scraper, even after continuous ripping which left furrows in the material, the Contractor experienced serious difficulties. It was found that the loading operation consumed three times the usual loading time because the scraper obtained partial loads only in the operation. The material was hard on the tires of the scrapers due to sharp fragments left after ripping. Boulders were sheared off, rather than dislodged, in the excavation. The material caused the cutting edges of the scrapers to be sheared off or broken. It damaged the tractor's shoes. The pick-up operation on occasion required the use of two tractors to push the scrapers through the hard material.

Problems were also encountered in excavation of the material by shovel and truck due to the inability of the equipment to achieve penetration of the material. In the test conducted by the Contractor, a ¾ yard shovel made repeated passes without obtaining a bucket full of material and was unable to dislodge a boulder, shearing off a portion thereof. The Owner used 4, 4½, and 5 yard shovels in its stripping operations. These shovels had also encountered difficulty in penetration of the material, and the operators found the digging hard.

In its disturbed state, when wet the material caused problems because it was slippery and would not support the equipment.

Rollman, who saw the Contractor at work, characterized the material as "very difficult and rugged" when handled by scrapers and "almost impossible to load and move" when wet.

In the blasting of the material, it was found that it did not fragment readily and evenly but tended to puff or "blow out." Prior to construction of the haul road, the Owner had drilled and blasted portions of the overburden where the material was encountered in depth. One of the Owner's employees recalled the drilling and blasting of portions of the bank along the East Face of the old quarry. It had done blasting in the overburden of the new quarry. In the completion of the construction of the haul road by the joint efforts of another contractor and the Owner, substantial parts of the remaining cut were drilled and blasted, some portions in a close pattern, prior to removal by shovels of 1½, 2½, and 4½ yard capacity.

Various opinions were expressed as to the choice of equipment best suited for excavation of the hard material and as to the necessity of blasting prior to moving. During the Contractor's performance of the construction, the Owner furnished some blasting services to facilitate the work. The contractor who participated in the completion of the project but did not finish his contract within the contemplated time testified that 1½ and 2½ yard shovels could practically move the material. Substantial portions of the material which he moved had been blasted.

Glynn testified that a ¾ yard shovel could excavate the material without continuous drilling and blasting; that is, the top several feet would not require blasting, but the lower portions of the excavation would so require. He also testified that blasting should be done where excavation was by a 2½ or 3 yard shovel, but that this would not require ripping.

One observer at the ¾ yard shovel test expressed the opinion that such a shovel

would not dig the material to any degree of satisfaction without blasting. Another contractor who had observed the excavation of the road at the Contractor's request thought that the material could not be handled with a 1½ yard shovel. Dr. Cleaves stated that it was not practical to excavate the material with a ¾ yard shovel without continuous drilling and blasting, and that a larger shovel would similarly require drilling and blasting for practical results.

Experience in completion of the haul road revealed that shovel and truck operations were seriously handicapped when the hard material was encountered in a wet state. After the Contractor terminated his operations, production by shovel and truck excavation appears to have proceeded at a slower rate than that achieved by scraper in a comparable time. Bark River Construction Company excavated only about 55,000 cubic yards of the 90,000 contemplated in its agreement with the Owner. The explanation offered was that wetness caused delays.

The Owner's claim that the difficulties encountered by the Contractor in excavation of the hard material were due to the use of improper equipment is not supported by the evidence. While it is neither possible nor necessary to make a finding as to the preferred equipment for excavation, the difficulties encountered in shovel and truck excavation indicate that the nature of the material rather than removal by scraper accounted for the problems in excavation.

In light of the evidence summarized above, it is the finding of the court that the hard material encountered in the excavation of the cut sections of the haul road on the Island is a very unusual, extraordinary subsoil condition.

The line of demarcation geologically speaking, between rock and other materials is not clearly defined. The term "solid rock" is not considered as an appropriate geological classification. The hard material does not present *all* the characteristics of solid rock. Principally, unlike rock, it separates into its constituent particles on manipulation in water.

For purposes of classifying the material as to excavatability, the court finds that the material meets the conditions for rock excavation where the test is based on the necessity of continuous drilling and blasting. The record compels a finding that it is not practical to move the material with a ¾ yard or with larger capacity shovels without drilling and blasting. There is testimony by men who performed the actual excavation and blasting that the Owner found it practical to blast overburden when stripping or excavating with its large quarry shovels.

In regard to the controversy about the power of various sizes of shovels, the court finds from the testimony that larger shovels would also require blasting for practical excavation of the material.

Claims that the shovel which performed the test at the request of the Contractor was not in good operating condition were overcome by the testimony of disinterested witnesses, invited to the test by the Contractor. The Contractor had given the Owner notice of its intention to conduct the test. The Owner, had it chosen to participate, could have assured the choice of equipment.

### 2. *The Owner's Knowledge*

From its exploration for further dolomite deposits on the Island, the Owner gained information as to the nature of the overburden generally in the areas explored which included some core drilling sites in high elevations near the haul road right of way. Arvin Mueller classified that material as clay or sand according to the color of the wash water of the drilling operation. The kind of material identified by him as "glacial till" was the kind of overburden he knew had been blasted by the Owner during Mueller's absence from the Island in 1955 to 1957 and knew was found in the East Face. Mueller thought there was no reason for the belief that granular material would be encountered in the cut sections of the haul road, as was stated in the specifications. He so informed Glynn and officers

of the Owner in writing and orally. The Owner further knew that it had experienced difficulty in stripping overburden; it understood that the blue-gray material was most difficult to excavate; and it knew that it had drilled and blasted in areas where overburden was encountered in depth, including some areas at the East Face of the old quarry.

The Owner offered little testimony concerning its experience with the excavation of overburden on the Island. It did not call its superintendent or his assistant who were Mueller's superiors and who, unlike Mueller, had consistently been on the Island and were more intimately familiar with the Owner's operations. The testimony of the Owner's employees who actually performed the stripping operations confirms the claims of the Contractor concerning the hardness of the material, the difficulty of excavation thereof, and the necessity for drilling and blasting where the material was encountered in depth. Their knowledge and experience must be deemed that of the Owner. The Owner failed to disclose this information to the Contractor.

### 3. *The Owner's Representations*

The Contractor, in the persons of Murphy, Sr., and Murphy, Jr., was given a tour of the site of the proposed construction on the Island on January 20, 1959. At that time there was a snow cover of about 18 inches. Frost penetration has been estimated at 2 inches because of the early snowfall that year. The tour was conducted by Arvin Mueller. It consisted of a jeep trip for viewing the haul road site at three of its intersections by cross roads, two other intersections being blocked by snow. Mueller also showed the Murphys two gravel pits which were near the haul road right of way and which were indicated on the plans, as well as an abandoned gravel pit on the right of way. He also drove them into the old quarry and showed them the bank of material, here referred to as the East Face, which extended about one-half mile in width. A passageway had been plowed through the snow to permit the jeep to approach this bank. There was drifted

snow at the bottom of the bank. Above the snow the bank gave the appearance of ordinary clay or frozen soil. It contained some boulders; some may have been visible in the snow at its foot. The bank was then eroded by the weather. Small gulleys were washed out by rain water.

Both Murphys recalled that Mueller told them that he had made test borings all over the Island and that the cut sections of the haul road would contain material similar to that which they saw in the East Face; that they would encounter gravel as had been shown them in the gravel pits; that the Owner had encountered no difficulty in excavating with quarry shovels and had never blasted overburden except where irregular rock was encountered; that there was no hardpan that could not be removed with scrapers; and that the reason the job was let out was that it was a scraper job and could be done more cheaply than with the Owner's shovels and trucks.

Mueller had been directed by his superior to show the East Face and to answer any questions that visiting contractors might ask. He denied that he was asked any questions by the Murphys except some relating to restaurants and accommodations. On the trial he claimed he could not remember everything that was said on the January 20, 1959, tour, but stated that he would remember what was not said. He overheard a conversation between the Murphys concerning scrapers and recalled that Murphy, Sr., was not wearing his hearing aid.

In addition to the above-mentioned statements by Mueller concerning the nature of the material to be encountered, the Contractor points to written representations concerning subsoil conditions of the haul road as found in the contract specifications. The particular items are the references to the anticipated presence of granular material, the fact that the presence of solid or ledge rock was not anticipated, and the use of the term "common excavation" as a designation for material that required drilling and blasting for its practical removal.

It is the finding of the court that under the circumstances of this case, the Owner's representations to the Contractor and the Owner's conduct in conducting a tour of the site constitute a failure to disclose material information concerning extraordinary subsoil conditions of the haul road site, which information was within the knowledge and experience of the Owner. Further, this failure to disclose, together with the false representations made by the Owner orally and in the specifications, misled the Contractor concerning the nature of the material to be encountered and the conditions of excavation.

The Owner, having had experience with subsoil conditions to substantial depth on the Island in its mining operations, knew that the material it demonstrated in a standing bank of material excavated prior to 1957 was representative of conditions found in the overburden. It knew that the material presented problems in excavation and that it had drilled and blasted similar material in its stripping operations. The standing bank of material had, to all but those having practical experience with its excavation, an appearance of ordinary clay such as might be designated by the term "common excavation" for pay purposes. The appearance gave no clue of the density and cementation of the material in an undisturbed state or of the necessity of drilling and blasting for practical removal. The showing of the East Face and of the gravel deposits in light of the language of the specifications, without disclosure as to the nature of the material and without disclosure that the Owner had no reason to anticipate the presence of granular materials in the cut sections, standing by itself, constitutes a misrepresentation as to the subsoil conditions.

Fair dealing required that the Owner disclose its knowledge of the unusual characteristics of the subsoil conditions on the Island to be encountered in the excavation of the haul road under the circumstances of this case, such as the presence of snow cover and frost at the time of the Contractor's inspection of the site, the shortness of time available for submitting bids, and the Owner's knowledge that the Contractor was not familiar with unusual subsoil conditions, as to which it had superior knowledge.

The use of the term "common excavation" in the specifications requires further comment. The specifications were prepared by the Owner's Engineer. Glynn, who was responsible for this work, was not familiar with subsoil conditions on the Island and made no independent investigation. The Owner did not inform him of its knowledge or experience with the material, Mueller reviewed the specifications drawn by the Engineer and offered suggestions in respect thereto. Glynn testified that as he understood the term "common excavation," this did not refer to material that required drilling and blasting. Although informed that there was no expectation of granular materials, Glynn did not correct the reference thereto in the specifications. He thought that the construction of the haul road would be an ordinary job that would not require drilling or blasting. Other contractors agreed that the term "common excavation" did not refer to material that required drilling and blasting. If the Engineer were deemed at fault in using the term "common excavation" under the circumstances, his fault would be chargeable to the Owner who knew of the use of the term and took no steps to enlighten either the Engineer or the Contractor concerning the true characteristics of the material so designated. The specification use of the term "common excavation" which conveyed to contractor-bidders an accepted meaning as to the characteristics of excavation of material intended to be included in this category is as misleading as though the Owner and Engineer had indicated soil identification notations for this material.

The court further finds that the Owner, through its representative who conducted the inspection tour of the Island in January 1959, made affirmative verbal misrepresentations in connection with

the demonstration of the site and the visible evidence of subsoil conditions. Mueller was familiar with these conditions through his experience with the drilling program and the Owner's operations on the Island. His statement that the Contractor "might expect" to encounter, or the more positively worded version recalled by the Contractor, constitutes misrepresentation as to then existing facts in light of the superior knowledge of the Owner. Except for the choice of words in this particular instance, with Mueller firm in his recollection that he used the more qualified expression "might," this witness was only certain as to what was not said but could not recall what other conversation had taken place.

The court finds that Mueller told the Murphys that the Owner had experienced no difficulty in excavation and had not resorted to blasting of the material, and that it contracted out the project because it could be performed more cheaply by means other than its own quarry shovels and trucks. The statements attributed to Mueller by the Murphys are consistent with the manner of conducting the tour, with Mueller's instructions from his superiors, and with the wording of the specifications which Mueller had reviewed. There would have been no purpose in showing a bidder evidence of certain subsoil conditions unless the Owner wished to convey the impression that these were indicative of what would be encountered on the Island generally and on the haul road site particularly.

### 4. *The Contractor's Conduct*

The specifications for the construction project were ready for prospective bidders in January 1959. The deadline date for submission of bids was January 29, 1959. Under these circumstances, the Contractor was required to make its on-the-site inspection and investigation within the limited time period and under conditions of snow cover and frost penetration as they existed on the Island in January 1959. The Murphys viewed the site and were shown evidence of sub-soil conditions which were represented to them as representative of material they would encounter on the haul road site.

The Contractor refused to accept a soil map offered to it by the Owner concerning soil conditions in the area. It has been conceded that this manual would not have disclosed the density and cementation of the subsoil material encountered on the Island.

It is the finding of the court that the Contractor's investigation under the circumstances was reasonable and that its reliance on the representations of the Owner was also reasonable.

Only one of the prospective bidders undertook a personal excavation on the road site. This man had had an experience with difficult-to-excavate material in the general vicinity. What appeared as innocent looking clay to one who had never encountered this condition would give this contractor notice of its unusual nature.

A contractor testified that a private owner would furnish subsoil information only if very unusual conditions of which the owner has knowledge were to be met. The Contractor to whom representations had been made as to subsoil conditions may reasonably have assumed that if unusual conditions existed, the Owner, with superior knowledge thereof, would call these to its attention.

Contacting other contractors in the area who might have been competing bidders is not a reasonable requirement of investigation. Well drillers would not have germane information concerning the haul road cut sections. It has also been suggested that the Contractor should have checked back with other officials of the Owner concerning information given it by Mueller. This would hardly appear to constitute an auspicious beginning of a contemplated contractual relationship, the Owner having designated Mueller to enlighten the prospective bidders.

It is further contended that the Contractor's claim for extra compensation

is barred because it failed to give written notice prior to commencement of the excavation as required in Section 1109.09 of the Wisconsin Specifications.

This court's ruling on severed issues that the Wisconsin Specifications were controlling in the construction project was confined to the questions there presented; that is, the applicability thereof to determine the classification of excavated materials. Section 1109, on its face, appears to be concerned with administrative details of measurement of work performed and payment therefor under a State of Wisconsin contract and relations between a contractor and the Wisconsin State Highway Commission. This section is not applicable here.

In any event, failure to give notice in writing under the circumstances of this case does not bar the Contractor's claim. The Contractor verbally informed the Engineer promptly after encountering the hard material that it would have to get additional compensation if it were to continue to encounter further material of this nature. This commenced a series of meetings and negotiations with the Engineer and the Owner concerning additional compensation. At the time the Contractor first asserted the claim, it had not made an exhaustive examination of the material to be encountered in the other cut sections. Unlike the Owner, it had no knowledge that the material would occur in all of the cut sections of the road. When the Contractor knew of the conditions in the other cut sections, the Engineer and Owner took the position that the Wisconsin Specifications were not applicable. During all these negotiations the Owner requested the Contractor to continue with the excavation. Having been aware of the Contractor's claim, the Owner could have protected itself against "exorbitant" claims by measuring the excavated material in dispute. The Engineer's resident engineer was on the Island and measured performance for compensation purposes. When it appeared that no agreement would be reached as to additional compensation, the Contractor gave written notice and continued the work under protest. It does not appear that thereafter the Owner or Engineer took measurements of the hard material being excavated.

The Owner contends that the Contractor, after discovering the hard material in May 1959, continued with the project and confined its claims to a request for additional compensation and then for compensation at the rock price, and that the Contractor did not assert the claim of fraud for almost two years after its discovery thereof.

It is further contended that the Owner and Contractor, subject to the approval of the Surety, negotiated for a settlement whereunder the Owner made concessions by extending the completion date under the contract and by performing drilling and blasting services for the Contractor. The settlement was not finally consummated because the Surety failed to approve it. Acceptance of the benefits and concessions is claimed to constitute waiver of any fraud.

Discovery of the fraud may be dated to the time the Contractor knew that it would encounter the hard material in all cut sections of any depth along the haul road. This knowledge was acquired by the beginning of August 1959. At that time the Contractor, although claiming that the material fell within the rock category, was negotiating with the Owner concerning additional compensation in the amount of its actual costs to date and was assured of the good faith of the Owner and of the Owner's desire to deal fairly. The Contractor was further requested to continue the work. After the Contractor was refused an increase in the common excavation rate, it requested the rock price. Then followed attempted settlement negotiations. The Contractor explains its silence during these times by its desire not to antagonize the officials with whom it was then dealing. The Owner was not misled or prejudiced by the Contractor's acquiescence in the Owner's request for continuation of the work during the negotiations.

The Owner also has shown no prejudice resulting from the delay in asserting the claim of fraud. It still asserts a breach of contract claim for failure of the Contractor to complete the project by the contract completion date. The concession as to completion date is therefore not real. As to drilling and blasting, the Owner includes this item in its damages requested in its counterclaim. The Owner does not appear to consider drilling and blasting as a gratuitous benefit it conferred on the Contractor. Where in fact no settlement was concluded and no benefits were conferred, the attempt at settlement negotiations constitutes no bar to the assertion of a fraud claim. The claim of fraud is barred only where a prior contract has in fact been superseded by a subsequent agreement. See Kintz v. Galvin, 219 Mich. 48, 188 N.W. 408 (1922); Darling v. Abbott, 221 Mich. 449, 191 N.W. 20 (1922); Doukas v. Gregory, 231 Mich. 631, 204 N.W. 697 (1925).

On the trial, the court held inadmissible the terms of the settlement negotiations. The Owner maintains that the door to this evidence was opened by testimony concerning the concessions granted therein. Treating the abortive settlement terms as an offer of proof, the court finds that the proposed settlement terms are not relevant to the issues. What the parties thought concerning just compensation for the excavation of the material, or how they construed the meaning of the terms "common excavation" and "rock excavation" during the negotiations in September and October of 1959, is not the measure of the fair value of services and materials rendered, nor is this indicative of their intentions in using these terms in the initial agreement.

5. *Classification of the Hard Material Under the Terms of the Contract and Construction of the Contract to Determine the Intended Compensation*

It was not within the contemplation of the Engineer that drafted the specifications nor within that of the Contractor that bid thereon that the term "common excavation" as used therein would include material which would require continuous drilling and blasting for its excavation by a ¾ yard shovel. The hard material encountered in the haul road construction showed this characteristic which is also stated as a condition of the rock classification under the provisions of the Wisconsin Specifications. Previously the court has held these applicable in the classification of materials excavated in the haul road construction except where inconsistent with the express language of the contract specifications.

The Engineer that was charged with classifying the excavated material made the determination that the Wisconsin Specifications were not applicable in the classification, notwithstanding the advice to the contrary rendered it by its attorney. After the Contractor had requested additional compensation and after the Engineer was apprised of the nature of the material encountered on the Island, Glynn consulted geological treatises on rocks and soils furnished to him by the Owner and thereafter determined to continue to classify the material as common excavation.

The court has found that it is not practical to excavate the material with a ¾ yard shovel without continuous drilling and blasting. This finding brings the material within the rock classification of the Wisconsin Specifications for purposes of determining the compensation of excavation. The material further substantially presents the characteristics of solid rock. The feature which is said to distinguish the material from rock—its ability to break up on manipulation in water—is one aspect which appeared to complicate the excavation and make it more burdensome. Since the material meets the test for excavation and since excavatability may be considered the determining factor in a classification for purposes of computation of excavation compensation, it is deemed that the hard material falls within the

rock category as described in the Wisconsin Specifications.

In view of the court's findings concerning failure to disclose and misrepresentation by the Owner, the Contractor's alternative claim for breach of contract for failure to reclassify the material within the rock price category or within a price category equivalent to the fair value of excavation is not appropriate. Assuming arguendo that the contract claim were appropriate, the evidence would support a finding that the parties failed to provide for an excavation price for the hard material since the term "common excavation" would not be applicable to material that required drilling and blasting for its practical removal. Further, the use of the contract terms "solid" and "ledge" rock as designating a compensation category creates inconsistency between the contract specifications and the Wisconsin Specifications. The Wisconsin Specifications may thus furnish a guide for compensation purposes in respect to material which shows the substantial characteristics of rock and meets the test of excavatability of these specifications. The breach of contract would not lie in the failure to pay the contract rock price but to pay the fair value of the excavation of material that does not fall within the common excavation category, which material shows the essential characteristics of rock excavation.

The contract being silent as to the amount to be paid for the excavation of this material, the court would find, by implication from the conduct of the parties, that the Owner agreed to pay the Contractor the reasonable value of the services performed and materials furnished. See Motor Wheel Corporation v. Rubsam Corporation, 92 F.2d 129, 130 (6th Cir. 1937), petition for cert. dismissed 302 U.S. 771, 58 S.Ct. 369, 82 L.Ed. 598.

Three Michigan cases are particularly applicable here: Hersey Gravel Co. v. State Highway Dept., 305 Mich. 333, 9 N.W.2d 567, 173 A.L.R. 302 (1943); W. H. Knapp Co. v. State, 311 Mich. 186, 18 N.W.2d 421 (1945); and Valentini v. City of Adrian, 347 Mich. 530, 79 N.W.2d 885 (1956).

The decisions in Hersey and Knapp are based on facts which present a striking similarity to the circumstances of the instant case. Contractors performing road construction for the State of Michigan in Baraga, Chippewa, and Mackinac Counties in the Upper Penninsula encountered an extraordinary subsoil material that presented unusual difficulty in excavation, which in these cases was by shovel and truck. The material is described in Knapp as "indurated," "like concrete," the shovel teeth would not penetrate, and loading production was about one-seventh of normal. It required three or four passes with a shovel to obtain a full bucket. When wet, the material "Turned to soup and mud" and was "impossible to haul on; really mirey, like clay, slippery." In blasting, the material would not fracture and crack.

In both cases the contractors claimed that the plans and specifications misled them as to the nature of the subsoil conditions they encountered. The court noted the brevity of time available for preparation of the bid, and in Knapp further commented on unfavorable snow conditions under which any investigation of the site by the bidder had to be conducted. Agents of the State had made investigation of the conditions of the road site—in Hersey by test holes and soundings in cuts; in Knapp by 4 x 6 x 2 foot deep holes and augur borings. The plans bore notations as to soil conditions such as "Baraga fine sandy loam," "Diana stony loam," and "Detour stony loam." The plans advised bidders that they were not to rely on soil notations found thereon as relieving them of the responsibility to satisfy themselves by examination of the site as to actual soil conditions. In both cases the trial court exonerated the agents of the State of any bad faith. It was held that the

specification descriptions did not give notice of the material encountered by the contractors.

██ The rule to be deduced from these cases may be stated as follows: An owner, having superior knowledge of extraordinary subsoil conditions, owes to a bidder the duty of full disclosure of all available information concerning the nature thereof. Failure to make full disclosure of all available material facts in clear-cut terms, understandable to the ordinary contractor, constitutes breach of warranty of the contract or actionable misrepresentation. Failure to comply with the requirement of independent investigation by the contractor was held not to constitute a defense to the breach of duty of full disclosure.

The above-stated rule was arrived at where the facts showed the presence of extraordinary material similar to that encountered on the Island, a subsoil condition not revealed by the descriptive language of the specifications. The rule was again applied in Valentini v. City of Adrian, 347 Mich. 530, 79 N.W.2d 885 (1956), where the owner's knowledge was based on investigation of the general construction area which included only portions of the actual site. In this case the extraordinary condition involved quicksand. The court quotes extensively from Hersey and Knapp. The rule of these cases does not appear to be inconsistent with Michigan law of torts and misrepresentation generally. See Groening v. Opsata, 323 Mich. 73, 34 N.W.2d 560 (1948); Sullivan v. Ulrich, 326 Mich. 218, 40 N.W.2d 126 (1949); Nowicki v. Podgorski, 359 Mich. 18, 101 N.W.2d 371 (1960); and Grand Trunk Western R. Co. v. H. W. Nelson Co., 116 F.2d 823 (6th Cir. 1941), petition for rehearing denied, 118 F.2d 252. The rule of the Knapp and Hersey decisions is not limited to Michigan law. In Walla Walla Port District v. Palmberg, 280 F.2d 237 (9th Cir. 1960), decided under Washington law, it was held that a contractor was entitled to rely on implied representations of a municipal corporation that it

fully disclosed all relevant information in its possession concerning subsoil conditions.

The rule also appears to correspond to prevailing practice in letting bids to the effect that no disclosure by an owner is necessary or customary *unless* said owner has knowledge of extraordinary conditions.

██ The findings of this court, as detailed above, are as follows: The material encountered by the Contractor was extraordinary in nature; the Owner had knowledge of the presence of the material on the Island where overburden was encountered in depth. It knew that similar material was present in the general area of the proposed construction and that the material presented extraordinary difficulty in excavation such as requiring drilling and blasting for practical excavation by shovel and truck. The Owner failed to disclose its knowledge and experience to the Contractor. It worded the specifications in language which misled the Contractor as to the nature of the material. The Owner's agent affirmatively misrepresented to the Contractor conditions on the haul road site. The Contractor made its investigation under unfavorable conditions in the short period of time allowed to it after release of the specifications. Its reliance on the representations and specifications was reasonable under the circumstances.

The foregoing findings clearly bring the case within the Michigan law of breach of warranty or misrepresentation and support imposition of liability based on breach of warranty or for misrepresentation.

██ In light of the court's determination that the Owner breached its duty of full disclosure and misrepresented the nature of the subsoil conditions to the Contractor, the findings as to the construction of the contract and intended compensation for excavation of the hard material are stated here conditionally to present complete findings on alternative issues submitted for the court's deter-

mination. Further, where it is determined that the Owner breached its duty of full disclosure and misrepresented the nature of the excavation to be encountered, its claim for damages based on breach of the construction contract must fall. The Contractor's failure to complete the road construction and to complete it within the time stated in the contract is directly chargeable to the Owner's precedent failure to disclose available information concerning the nature of the material and to its misrepresentations which led the Contractor to miscalculate the price for excavation. The Owner has cited no authority which permits the defaulting party on a contract or one found guilty of misrepresentation to recover damages.

## 6. Damages—Measure and Computation

■ The measure of recovery applicable to breach of implied warranty and misrepresentation is stated in the Hersey and Knapp cases as reasonable damages, compensatory of the cost of the work of which the owner received the benefit, over and above the amount paid by the owner. See also Grand Trunk Western R. Co. v. H. W. Nelson Co., 116 F.2d 823 (6th Cir. 1941).

The Contractor, under the breach of warranty and misrepresentation count, asks for damages in the total amount of $516,858.61. Its statement of costs and receipts on the haul road project is as follows:

| ITEM | COSTS | |
|---|---|---|
| 1 | Materials Used | $ 26,235.44 |
| 2 | Direct Labor | 168,873.80 |
| 3 | F. I. C. A. Tax | 3,654.54 |
| 4 | Unemployment Tax | 2,199.98 |
| 5 | Welfare Insurance Fund | 2,031.68 |
| 6 | Subcontract | 27,431.00 |
| 7 | Transportation | 25,934.38 |
| 8 | Truck Rental | 16,222.94 |
| 9 | Equipment Rental | 187,535.60 |
| 10 | Equipment Repairs | 129,369.02 |
| 11 | Equipment Depreciation | 92,681.84 |
| 12 | Gas, Oil, Grease | 40,128.07 |
| 13 | Dock Rental | 300.00 |
| 14 | Insurance | 18,044.88 |
| 15 | Bonds Premium | 2,696.20 |
| 16 | Electric Power | 77.46 |
| 17 | Telephone | 671.97 |
| 18 | Michigan Use Taxes | 8,657.37 |
| 19 | Michigan Personal Property Tax | 2,730.71 |
| 20 | Interest Expense | 25,910.65 |
| 21 | Rock Test | 647.31 |
| 22 | Salary—Pat Murphy, Sr. | 4,800.00 |
| 23 | Clerical Wages | 7,500.00 |
| 24 | Office Supplies | 30.00 |
| 25 | Legal Fees | 1,232.89 |
| | Total Direct Costs | $795,597.73 |
| | Payments Received on Contract | 378,281.12 |
| | Net Direct Loss | $417,316.61 |
| 26 | Loss of Profits | 99,542.00 |
| | Total Loss | $516,858.61 |

The Owner contends that there is no testimony that the expenditures were reasonable and that the Contractor incurred these expenses without regard to the best and most economical method of excavating the material. Further, it is claimed that the Contractor had inadequate supervision and ran a poor job and failed to mitigate damages by its failure to try other methods of excavation.

The court finds that the use of scrapers was not inappropriate. The evidence shows that excavation by scraper resulted in the excavation and moving of greater quantities than removal by shovel and truck in comparable periods of time. Shovel equipment also was subject to damage. Additionally, shovel and truck production was handicapped when the material was encountered in a moist state and required the laying of a rock foundation for operations under these conditions.

It is clear that difficulty was encountered which was not traceable to inefficient operation but to the nature of the material being excavated.

The Owner challenges particularly several items of costs. Item 11, Equipment Depreciation, in the amount of $92,681.84, is based in part on an appraisal of the machinery by an experienced appraiser who had rented or sold part of said machinery to the Contractor. The appraiser had seen the equipment shortly before and as it was being shipped to the Island in April and May of 1959. He again saw the equipment on its return from the Island in 1960 and formed opinions as to its value. His computations as to valuations were made in 1964, based on his recollections of his prior views formed in the light of appraisal book information and his own knowledge. The appraiser's valuations as to depreciation of the equipment meet the requirement of reasonable degree of certainty under the circumstances.

The Owner further contends that Item 20, Interest Expense, in the amount of $25,910.65, is not a proper item of cost. The court is of the opinion that an own-er is not chargeable with the cost of financing the operations of a contractor who must resort to outside financing for the project. The item is disallowed as not constituting an item of reasonable cost of construction.

As to Item 21, Rock Test, the court finds that the expense of conducting the test is not an item of cost from which the Owner derived any benefit. This item is disallowed.

Regarding Item 26, Loss of Profits, the Owner contends that the computation is based on speculation and that there is no basis for assuming that the Contractor would have continued in business for four additional years. The Contractor showed its net income for the five years preceding the undertaking of the haul road construction project. The average net income for these years was the equivalent of a 5.4 per cent markup over the Contractor's total costs during these years. This computation serves as a sufficient basis for allowance of a like markup as profit on the amount of total costs as found reasonable by the court. This amount is the total claimed cost less the disallowed items of interest and cost of shovel test, or $769,039.77. Allowable profit at a rate of 5.4 per cent in respect thereto is in the amount of $41,528.15.

Loss of profits for future years of operation, even though they might be attributable to the conduct of the Owner, is speculative and is disallowed.

In respect to the breach of warranty and misrepresentation count, the court finds allowable costs as established to a reasonable certainty in the amount of $769,039.77 plus loss of profits of $41,528.15, less payments received on the contract of $378,281.12, or a total amount of $432,286.80.

The decision of the court in this case is premised upon its determination of liability for breach of implied warranty and misrepresentation under the rule stated in the Hersey and Knapp cases. The following findings on alternative claims for damages are stated here con-

ditionally and only for the purpose of presenting complete findings on all issues before the court.

In respect to the claim in quantum meruit, the measure of recovery is conceded to be the reasonable value of the services rather than compensation for the Contractor's costs. The Contractor submits that $1.75 per cubic yard is a reasonable compensation for the excavation of the hard material. It estimates that it removed 317,040 yards of the hard material for which it was paid 42 cents per cubic yard less 15 per cent withheld in the amount of $58,655.00.

■ The amount of excavation of the hard material is an estimate based on the recollection of the persons who actually performed the work and is corroborated by testimony of observers who recalled that the material was encountered from one to one and one-half feet beneath the level of the ground, and that it occurred substantially throughout each cut of the haul road excavated by the Contractor. Had the Owner wished to protect itself against the claims of the Contractor, it could have measured the amount of disputed excavation. It had notice that the Contractor was demanding extra compensation therefor almost immediately after construction was commenced. It further had notice that the Contractor claimed the rock price by late July or early August of 1959. The Engineer undertook no separate measurements. Arvin Mueller, who checked the estimates before submission to the Owner for payment did not recommend that measurements were to be taken concerning the disputed excavation. The estimates submitted by the Contractor are the most reliable available information of record concerning the amount of hard material. It is not necessary to prove every item of recovery with mathematical certainty. Grand Trunk Western R. Co. v. H. W. Nelson Co., 116 F.2d 823, 838 (6th Cir. 1941). Estimates may provide sufficient certainty for the award of damages. Under the circumstances of this case, the estimates submitted by the Contractor as to the amount of hard material excavated on the haul road may stand.

In support of its figure of $1.75 per cubic yard as fair value for excavating the hard material, the Contractor contends that this was the agreed price for rock excavation and that the hard material had the characteristics of rock for purposes of excavation; that the Contractor's actual cost of excavation exceeded the $1.75 price; and that the Owner's cost of excavation in completion of the haul road also substantially exceeded the claimed fair value of compensation.

The Owner contends that the material has been and could be economically removed at a cost of from 60 to 80 cents per cubic yard and that such operation would show a profit to the contractor. There is no evidence of probative value to support this contention. The estimates of other contractors who had no experience with the actual excavation are not relevant. The contractor who shared in the completion of the excavation of the cuts of the road was paid 72½ cents for the excavation, part of which had been drilled and blasted by the Owner. Although this contractor testified that he "made out" on his contract with the Owner, there is evidence that his work covered additional items and that he was eligible for bonus payments. Further, this excavator failed to complete the work he had undertaken. Another contractor, who had experience with similar material in the Upper Peninsula, believed that 80 cents per cubic yard was a fair price for its excavation but had no actual experience with the conditions of the haul road. The Owner's costs were approximately 90 cents per cubic yard for excavation only.

To arrive at a figure comparable to that of $1.75 submitted by the Contractor, there must be added charges for drilling and blasting attributable to the approximately 48,000 cubic yards which the Owner removed, the cost of spreading and grading the material, and the cost of laying stone to support the shovels and permit movement of the trucks which was not wholly due to the simultaneous opera-

tion with other contractors. Although the costs of these additional items cannot be determined with mathematical certainty from this record, there is evidence to support a finding that the attributable cost of stone, drilling and blasting, and spreading and grading would increase the 90 cent figure by at least 60 cents a cubic yard for a total of $1.50 per cubic yard.

In the event recovery were based on a quantum meruit claim, the court would find the damages to be in the total amount of $401,058.20, arrived at by computing the cost of excavation at a rate in the amount of the difference between fair value of $1.50 and the amount paid of 42 cents, or a rate of $1.08, and adding thereto the amount withheld by the Owner of $58,655.00.

In its counterclaim against the Contractor and its cross-complaint against the Surety, the Owner has based its claims for damages on breach of the construction contract. The measure of recovery, conceded here, is the excess of the reasonable costs of completion over the cost of work if it had been performed in accordance with the contract. The claim is in the amount of $124,259.69.

The Contractor and Surety challenge the following items of the Owner's computations: depreciation in the amount of $9,989.10 and executive salaries in the amount of $11,722.76.

The court finds that these are reasonable items and that the proof submitted in respect thereto meets the requirement of certainty. As has been noted in connection with Contractor's claims, mathematical certainty may be impossible of achievement in damage claims, and reasonable estimates will suffice. The straight line method of depreciation is an accepted cost accounting practice. For purposes of this suit, the Owner is not required to conform its cost estimates to its tax practice. The cost of executive salaries is high in relation to the work performed. Nevertheless, there is basis in the evidence to support the claim. Interest on the Owner's claim is not allowed. The amount thereof remained unliquidated until determination based on proof on the trial. Empire Industries, Inc. v. Northern Assurance Company, 342 Mich. 425, 70 N.W.2d 769, 771 (1955). If the Owner were to prevail on its counterclaim against the Contractor and on its cross-complaint against the Surety, the amount of its recovery would be in the sum of $124,259.69.

The foregoing opinion sets forth the court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure. Briefly summarized, the court's findings of fact and conclusions of law are as follows:

## FINDINGS OF FACT

1. There is diversity of citizenship between the parties, and the action involves the requisite jurisdictional amount.

2. The material encountered by plaintiff in the excavation of the haul road on Drummond Island, Michigan, constituted an extraordinary subsoil condition.

3. The practical excavation of this material required drilling and blasting before it could be removed by shovels of ¾ yard or larger capacity.

4. The defendant had knowledge of the extraordinary character of the material.

5. The defendant failed to disclose its information concerning the extraordinary nature of the material and made misrepresentations in respect thereto to the plaintiff in the language of the specifications and in the view it furnished plaintiff of subsoil conditions on Drummond Island.

6. Defendant's representative made express misrepresentations concerning the nature of the subsoil on Drummond Island.

7. Plaintiff's reliance on the representations of defendant concerning subsoil conditions on Drummond Island was reasonable under the circumstances of this case.

8. Plaintiff was misled concerning the nature of subsoil conditions on Drummond Island by defendant's failure to dis-

**530**

close information and misrepresentations in respect thereto.

9. Plaintiff's assertion of the claim of misrepresentation was timely under the circumstances of this case.

10. Plaintiff's reasonable costs and loss of profits incurred in the excavation of the haul road in excess of amounts paid to it under the contract are in the total amount of $432,286.80.

## ALTERNATIVE CONDITIONAL FINDINGS

1. The construction contract and specifications did not provide a price category for the compensation of the "hard" material encountered in the excavation of the haul road.

2. The reasonable value of excavation of the material encountered in the excavation of the haul road is $1.50 per cubic yard.

3. The amount due the plaintiff under the quantum meruit count is the sum of $401,058.20.

4. Defendant's costs of completion of the haul road in excess of the contract costs are in the total amount of $124,-259.69.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the cause under Section 1332 of Title 28 U.S. C.A.

2. Defendant's failure to disclose information concerning the extraordinary nature of the subsoil encountered in the excavation of the haul road on Drummond Island and its misrepresentations in respect thereto constitute actionable breach of implied warranty and misrepresentation under Michigan law.

3. Plaintiff did not waive its claim for misrepresentation.

4. The defendant is liable to the plaintiff on the breach of implied warranty and misrepresentation claim for damages in the amount of the reasonable costs and loss of profits incurred by plaintiff in respect to the excavation of the haul road.

5. The defendant is not entitled to recovery for its costs incurred in the completion of the haul road in excess over contract costs where it was guilty of breach of implied warranty and misrepresentation.

The clerk is hereby directed to enter judgment as follows:

1. For the plaintiff and against the defendant in the amount of $432,286.80, together with its costs and disbursements in the action and for dismissal of the counterclaim of the defendant.

2. For the cross-defendant and against the defendant for dismissal of the cross-complaint of the defendant and for cross-defendant's costs and disbursements herein.